The State v. Allen.

---

## THE STATE v. ALLEN.

1. **Criminal Law**: ACCOMPLICE: CORROBORATION OF. It is not necessary in order to sustain a conviction that an accomplice should be corroborated in every material fact to which he testifies; and where the jury found there was sufficient corroboration of the evidence of the accomplice this court will not interfere, provided there were facts in evidence from which the jury might fairly have so found.

2. ——: ——: CORROBORATING TESTIMONY: CREDIBILITY OF WITNESS. It is for the jury to determine the credibility of the witnesses, where there is contradictory evidence as to the corroborating facts.

*Appeal from Fremont District Court.*

THURSDAY, DECEMBER 15.

THE defendant was tried and convicted of the murder of John Long. He was sentenced to the penitentiary for life,

and now appeals to this court for a reversal of the judgment against him.

*C. S. Keenan* and *Hepburn & Thummel*, for appellant.

*Smith McPherson, Attorney-general,* for the State.

ROTHROCK, J.—I.   John Long and his wife, Elizabeth Long, resided on their farm in Fremont county.   They were advanced in years; their children had grown up and left them for homes of their own.   The record before us does not disclose the age of John Long.   It appears that his wife is sixty-seven years old.   Sometime in the summer or fall of 1878 the defendant took up his residence with Long and wife under an arrangement by which he was to cultivate the farm for the ensuing year.   Afterwards a written lease was made and signed by the parties.

About four o'clock on the morning of January 15, 1879, Elizabeth Long went to the home of one Tarrence, who owned and lived on an adjoining farm, and called him and requested him to go to her house for the purpose (as we understand the record) of searching for her husband, who, she alleged, was missing.   Tarrence at once went to the house of the Longs, and stopping at the stable called Mr. Long two or three times, and getting no answer he went to the house and called the defendant, who was in his room in the upper story.   The defendant came down stairs, and he and Tarrence went to the stable, where they found the dead body of Long lying in a stall in which one of his horses was standing.   A candle which had been lighted, and a candlestick were found near his body.   Tarrence asked Allen to take one of the horses and alarm the neighbors.   Allen declined to go upon the ground that he was lame.   It appears that he claimed to be lame from the effect of a kick received the day before from the horse in the stall in which the dead body was found..   Tarrence went out into the neighborhood and reported the finding of the body, and

soon a large number of persons collected at Long's place. The body was carried to the house, and a large number of wounds were found thereon. The skull was crushed in; there were wounds upon the face; the breast-bone was crushed, and some ribs were broken. There were marks of blood on the stall near where the body was found and within a short distance from the head of the deceased which had the appearance of having spurted up from the body and then run down the wall. There was also blood under the body. The hands were tightly clasped, and held in their grip some of the litter and trash of the stable, and hot water had to be used to relax the fingers to remove it. The horse which stood in the stall where the body was found was of a nervous, restless, and vicious disposition, as appears from the evidence. He had recently been shod with sharp shoes.

A coroner's inquest was held on the same day, and the conclusion was arrived at that the deceased came to his death by being trampled by the horse, and the theory of the defense now is that the old man heard some disturbance among his horses in the night and arose, dressed himself, and went out to the stable and was kicked and trampled to death by the horse. In a few days another inquest was held and there began to be a suspicion that Long had been murdered by his wife and the defendant Allen. They were arrested and imprisoned in the jail of the county. Both stoutly denied their guilt. The wife was sworn as a witness and testified at both inquests that she and Allen were innocent of the crime charged. She repeatedly stated to others during her imprisonment in jail that she was innocent and that Allen was innocent. She was brought before the grand jury in October, 1879, and there stated that the defendant, Allen, told her that he had made way with the deceased, and that was all she knew about the manner of his death. Upon the trial her testimony, in substance, was as follows: "That about a week before the death of

the old man, Allen proposed to her that he should be put out of the way." Again on the night before his death the defendant said "he was going to put the old man out of the way"; that before defendant went to bed he came in from the porch, and "had a hammer in his frock," and after a time he went up-stairs to bed; that in the night he came down stairs and into the bed-room where witness and her husband were sleeping, and that thereupon she ran out of doors and behind the smoke-house; that she heard defendant pound deceased on the head; that the handle of the hammer broke, and he then got a shovel with which he struck him; that defendant called her from behind the smokehouse, and that she went into the house, and they wrapped a quilt around his head to soak up the blood; that they then put his clothing on, and that after he was dead the defendant "took him and kind of dragged him out through the porch, and down to the south door of the stable, and laid him down inside of that door," and that witness went around to the east door and opened it so that defendant could see, and that then defendant put the dead body under the horse with a fork, and then "smashed" the fork, and told witness that she should say that "the old man heard a noise at the barn, and got up and went down, and that the horse had killed him;" that they burned the quilt used to wrap up his head, and washed the blood-stain from the carpet. In addition to the statement that the defendant dragged the body she stated that he "took him on his back," and laid him down inside the stable.

It will be observed that Mrs. Long virtually acknowledges that she was an accomplice in the commission of the crime of
1. CRIMINAL law: accomplice : corroboration of. which she testifies. It is urged with great earnestness by counsel for the appellant that a new trial should have been granted because her evidence is not corroborated as required by section 4559 of the Code, and as we regard this question the all-important one in the case, we have read and re-read the record, and given to it

that careful consideration which the importance of the case and the consequences attending the judgment demand.

It must be admitted that the witness does not appear in as favorable a light as she would have done if she had at once, upon being called upon for a statement of facts, given the evidence which she finally gave upon the trial. But the testimony of accomplices requires corroboration because, upon their own confession, they are partners in the crime. She confesses that she was so wicked and depraved that she joined in the willful, deliberate and premeditated murder of her husband. Her repeated denials of her guilt, and of the guilt of defendant, and that, too, under oath, were all submitted to the jury with the other facts in the case, and if the jury found that there was sufficient corroboration of the evidence, it is not for us to interfere, provided there were facts in evidence from which the jury may fairly have found that she was sufficiently corroborated. It will also be remembered that it is not necessary that an accomplice should be corroborated in every material fact to which he testifies. " If the jury are satisfied that he speaks the truth in some material part of his testimony, in which they see him confirmed by unimpeachable evidence, this may be ground for their believing that he also speaks the truth in other parts as to which there may be no confirmation." *State v. Schlagel*, 19 Iowa, 169.

We will proceed to an examination of other facts which were put in evidence, and which the State claimed " tended to connect the defendant with the commission of the offense."

It appears that there was a slight fall of snow on the night of Long's death, and before, it is claimed, the crime was committed. Mrs. Long testifies that she stood and waited behind the smokehouse while the defendant killed her husband. Henry Long, a son of deceased, and also a son of Mrs. Long, testified that on the day after the alleged murder " he looked around the smokehouse, and there were tracks of a woman. I could see where she had stood." Another witness testified

that she "saw a stain on the wall of the bed-room on the north side, down near the base; it is right to the left of the door as you enter the bed-room from the sitting-room. It looked like blood; we examined it; I should think it as large as a half dollar; it is on the right of the door as you enter the bed-room from the sitting-room." It does not appear from either the abstract of the appellant or that of appellee when the witness stated that she discovered the blood-stain, of which she testified. Catharine Hall, another witness, testified as follows: "When I arrived at four o'clock of the afternoon of the death, noticed that there seemed to be something on the snow like there was something dragged down the path toward the little gate; it looked as though there had been clothing dragged down there; it was all the way from the house to the little gate; several rods—not quite one-third the way to the stable." She also testified that on Sunday after the funeral she "noticed a good many marks of blood on the snow east of the gate toward the stable, on the path from the house to the stable."

Sometime after the death of Long a letter was found in a public road in the neighborhood, in which the writer intimated that he and the one to whom the letter was addressed murdered Long, and urging the one to whom it was written to "put it on them two boys and the old woman." This letter was not enclosed in an envelope and commenced with the words "Dear sir." It was signed by no one, but requested an answer to be directed to J. J. Flem, Denver City.

We need not set out this letter at length. It was claimed by the State that it was in the handwriting of the defendant, and was introduced in evidence for the purpose of showing that the defendant attempted to direct public attention from himself to other parties.

In addition to these facts Daniel Tarrence testified that when he called defendant down from his bed on the morning of the alleged murder, the defendant inquired where Mrs.

Long was, and the witness answered: She says "you sent her after me." And he replied, "Well, I have been asleep since."

There are other facts of minor importance, which, although they may not tend directly to connect the defendant with the commission of the crime, yet were entitled to consideration by the jury. Among them, it appears a very close intimacy existed between the defendant and Elizabeth Long. They were in the habit of holding private and protracted conversations with each other in a confidential sort of way to such an extent as to be noticeable to visitors at the house. Another circumstance was, that on the day of Long's death some of the witnesses testified that at times the defendant was lame, and at other times there was no limp in his walk.

Taking all these facts into consideration, and still this man may be innocent. But that was a question for the jury to determine. That the jury were fully warranted in finding that there was sufficient corroboration of the accomplice, we have no · manner of doubt.

2. ——: ——: *corroborating testimony: credibility of witness.*

This is upon the theory that the corroborating evidence above set forth was true. It is to be admitted that no other witnesses testified to marks of blood, and the dragging of something upon the snow; to tracks back of the smokehouse, and to what appeared to be a blood-stain in the bedroom, and indeed there is evidence directly contradictory to most of these facts. But here again we cannot invade the province of the jury. It was for them to determine the credibility of the witnesses and give credence to such as they believed to be speaking the truth.

It is urged that Elizabeth Long is not entitled to belief because she testified that deceased was dead when he was put into the stall with the vicious horse. It must be conceded that this was not true. The spurting of blood upon the wall of the stable and the clasping of the straw and trash in the hands would indicate that he died after he was laid upon the floor of the stable, either from the kicking of the horse, or by the

hands of the defendant. But it does not follow that the evidence of the witness should be rejected for this misstatement. It may have been that although she supposed him to be dead he was only stunned into insensibility by the blows inflicted by the defendant, and that he actually died after he was put into the stable. If he was assaulted by the defendant and wounded so as to render him insensible, and placed in the stable, and afterwards died, even though he may have been kicked and trampled to death by the horse, the defendant would be guilty of murder the same as though deceased had died in the house from the wounds there received.

There was much testimony in the case by physicians and others, as to the nature of the wounds. Some testified that certain of the wounds could not have been inflicted by the horse, and others testifying that they all could be accounted for in that way. If the jury believed the former, it was a circumstance tending to corroborate Mrs Long, to the extent, at least, of showing that the deceased came to his death by violence at the hands of some one.

II. No exceptions were taken to the instructions given by the court to the jury. It is claimed, however, that the court erred in certain rulings in the admission and exclusion of evidence. We will now proceed to consider these objections.

It is claimed that the court permitted the witness Tarrence to detail a conversation he heard between the deceased and his wife, on the subject of a contemplated separation, and from which it appeared that the wife thought of leaving him. It is true that such a conversation was testified to by the witness. But it appears from appellee's abstract that counsel for defendant immediately objected and that the objection was sustained. The court remarked: "If this witness was present in any transaction between the prisoner and the deceased, that would be competent; but you cannot prove it by any declaration of deceased to witness." It thus appears that the objec-

tionable testimony was ruled out and taken from the consideration of the jury.

III.    It is urged that the letter above alluded to, and also an account book which was found in the prisoner's trunk, were permitted to go to the jury as evidence without satisfactory proof that they were in his handwriting.    Here again it appears, from the appellee's abstract, that the lease of the farm, signed by the defendant, was used on the trial by witnesses who claimed to be experts in the comparison of handwriting, and after such evidence all these papers were submitted to the jury.    There was no error in this.    The witnesses who testified to the handwriting by comparison, are shown, as appears from appellee's abstract, to be qualified as witnesses.    It is proper to observe, that appellee's abstract correcting that of appellant is in no manner controverted; and must be accepted as correct.

IV.    Frances Ayres, a witness for the State, was interrogated in her examination in chief as follows:

"Did you notice Finis Allen at the funeral; if you did, what was his conduct there?    Ans.    I thought he was rather bold. I was there only a short time.

"What was the condition of Mrs. Long at the funeral that day?    Ans.    Oh! I don't know; I thought she didn't take it very hard."

It is urged that this evidence was incompetent, because it is a mere opinion and conclusion of the witness without the statement of facts as to defendant's conduct.

It is sufficient to say of this point that the record does not show that any objection whatever was made to the testimony of the witness.

V.    E. C. Wilcox, the coroner, before whom both inquests were held, was called as a witness by the defendant, and was asked what Mrs. Long testified to at the second inquest.    The question was objected to, and the objection was sustained. This ruling is claimed to be erroneous, because the evidence

sought to be elicited was proper for the purpose of impeaching Elizabeth Long.

But we fail to find that any foundation was laid for such impeachment by the cross-examination of Mrs. Long. It is true that the counsel for defendant in her cross-examination asked her if she did not testify, at the second inquest, that the old man went down to the stable, and that he was gone so long that she became alarmed. She answered, admitting that she did so testify, and stated that the defendant told her to do so. Indeed, the whole record shows that Mrs. Long persistently denied all knowledge of the crime until she appeared before the grand jury. This conduct on her part could not be made more striking and apparent if Wilcox had been permitted to repeat what she admitted as to her testimony at the second inquest.

We have examined this record through and through and given the argument of counsel for defendant the most careful consideration, having noticed in this opinion all of the points made, and reach the conclusion that the judgment of the District Court must be

AFFIRMED.