## STATE v. HICKS *et al.*

1.  Section 7384, Comp. Laws, is as follows: "A conviction cannot be had
    upon the testimony of an accomplice unless he be corroborated by such
    other evidence as tends to connect the defendant with the commission
    of the offense, and the corroboration is not sufficient if it merely show
    the commission of the offense or the circumstances thereof." The cor-
    roborative evidence required by this section is not necessarily such
    evidence as will of itself support a conviction, and thus render that of
    the accomplice superfluous or redundant, but it is evidence that tends
    to support or strengthen that of the accomplice in the respect that "it
    tends to connect the defendant with the commission of the crime."

2.  The law is complied with if there is some other substantial evidence fair-
    ly tending to "connect the defendant with the commission of the crime"
    so that his conviction will not rest alone upon the evidence of the ac-
    complice.

3.  The evidence in this case examined, and *held*, not only to satisfy the re-
    quirement of the statute, but to justify the verdict of the jury.

4.  It was not error in the trial court to refuse an instruction containing the
    following: "The purpose of the statute of this state upon this subject
    is to prohibit a conviction unless there is some evidence entirely exclu-
    sive of that of the accomplice, which of itself, and without the aid of
    that of the accomplice, establishes the guilt of the defendant beyond
    reasonable doubt."

(Syllabus by the court.    Opinion filed Sept. 12, 1894)

Error to circuit court, Meade county. Hon. A. J. PLOW-
MAN, Judge.

Indictment charging the plaintiffs in error with the crime
of murder. From a judgment of conviction they bring error
to this court. Affirmed.

The facts are stated in the opinion.

*Wm. H. Parker, Rice & Polley* and *M. McMahon,* for plaintiff
in error.

The testimony of an accomplice should have but little
weight for the reason that in nearly every instance it is given
with the hope that it may aid him and lessen his punishment.
People v. Ames, 39 Cal. 403; Id. v. Eckard, 10 Cal. 110; 1
Whart. Am. Crim. Law 785. The testimony of the accomplice

must be corroborated as to the commission of the crime by the defendant.    1 Am. Eng. Enc. Law 77; McConnell v. State, 18 S. W. 645; Whitlow v. State, 18 S. W. 865; Holmes v. State, 17 S. W. 1089; Clark v. State, 17 Id. 942; Smith v. Commonwealth, Id. 182; Gilman v. State, 3 Tex. App. 132; Hoyle v. State. 4 Tex. App. 239; State v. Chyo Cheagh, 4 S. W. 704; People v. Thompson, 60 Cal. 380; People v. Smith, 33 Pac. 58; Taylor v. Comm., 8 S. W. 461; Roqumone v. State, 11 S. W. 834; Stonard v. State, 10 S. W. 442.

*Coe I. Crawford*, Attorney General, and *Thomas Harvey*, for defendant in error.

KELLAM, J.    On the 23rd day of May, 1894, in the circuit court for Meade county, plaintiffs in error were convicted of the crime of murder in killing one John Myers on the 14th day of January, 1894.    For a reversal of the judgment, plaintiffs in error assign generally errors in the admission and exclusion of evidence, the insufficiency of the evidence to corroborate that of William C. Walker, an accomplice, and the refusal of the trial court to give certain instructions asked for.

The first assignment is too general to be available, and is not helped out by the brief or argument of counsel, as no particular ruling of the court is therein referred to, or claimed to be erroneous.    We conclude that plaintiffs in error rely only upon the second and third grounds, as their brief and argument are confined to them.

One William C. Walker was jointly indicted with these plaintiffs in error for the crime of which they were convicted. The latter were tried together, and separately from Walker. Upon their trial, Walker was a witness for the state, and testified fully to the fact and circumstances of the killing.    Plaintiffs in error contend that without the testimony of Walker there was nothing upon which to base a conviction, and that his testimony, he being an accomplice, was not so corroborated as to justify a conviction upon it.    The rule as to the necessity

and extent of the corroboration in such cases, which in many— perhaps most—of the states rests entirely upon the practice and policy of the courts, is statutory here, and is as follows: "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof." Comp. Laws, § 7384. The corroborative evidence contemplated by this section is not necessarily such evidence as will of itself support a conviction, and thus render that of the accomplice cumulative or superfluous, but it is evidence that tends to support that of the accomplice in the respect that "It tends to connect the defendant with the commission of the offense;" in other words, the corroborative evidence must be such as fairly leads to the inference that the testimony of the accomplice implicating the defendant in the commission of the offense is true. Some substantial evidence of this sort is essential, but its extent or degree of probative force is for the jury. It is not necessary, as argued by plaintiffs in error, that the corroborative evidence of itself should be sufficient to prove the commission of the crime, or establish the defendant's guilt. To require that would be to render the evidence of the accomplice unnecessary and redundant. To corroborate means to strengthen; in this case, to make stronger the probative criminating force of the accomplice's testimony. His testimony alone is not self-supporting. It must be corroborated. Its credibility must be strengthened. The requirement of the statute is not that such corroborating testimony shall prove or establish the defendant's connection with the commission of the crime, but that it shall so "tend." The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice. This is the rule in states having statutes like

ours.   People v. Everhardt, 104 N. Y. 591, 11 N. E. 62;  People
v.   Elliott,  106  N.  Y.  288,  12  N.  E.  692;   People  v.  Mc
Lean,  84  Cal.  480,  24  Pac. 320;   People  v.  Cloonan,  50  Cal.
449;  Ross v. State,  74 Ala. 532;  State v. Thornton, 26 Iowa, 79;
Smith v. Com. (Ky.)  17  S.  W.  182.   This is also the rule,  in
substance, in states  having  no  statute,  but in which the.prac-
tice  of  the  courts .has  become  so settled as to impose a duty
upon the trial court  to  instruct  the  jury  that they should not
convict upon the uncorroborated testimony of an accomplice.   1
Greenl.  Ev. § 381, and  note;  Rosc. Cr.  Ev.  p.  120;  Com. v.
Holmes, 127 Mass. 424.

Turning now to the evidence in the case, let us  see  if  the
testimony of Walker, the acomplice, was substantially corrobo-
rated as to material facts fairly tending to connect plaintiffs in
error with the commission  of  this  crime.   Walker  testified:
That  he  had  been  acquainted with Robert Hicks about three
years,  and  that he first met Jay Hicks about the middle of the
previous October (which would be about three months  prior  to
the  alleged  murder).   That about  the  last of October or the
first of November, while he and  Jay  and  Robert. Hicks  were
"going down the Belle Fourche river together, Jay Hicks asked
him if he knew any place  where  they  could  go and  make  a
raise."   That he asked him what kind of a raise he meant.   That
Jay  then  asked  him if he "knew any one that had money, to
hold him up, and get it."   That Jay said there was an old bach-
elor lived over on the Elk creek breaks who had sold his cattle,
and was afraid to put his money in the bank, and  "he  thought
it  would be a good place to go and make a raise if he only had
a gun."   That after  that  he  frequently  came  to  witness'
house, and often asked him  "if he had run onto a gun yet."
That Sunday afternoon, December 10th, he told witness that he
had been up to Cottle's, and that he had a "44 Colt's six shoot-
er," that he tried to buy it, but Cottle would not let  him  have
it because he had only seven dollars to pay down  on  it.   That
afterwards witness and Robert Hicks went to Cottle's store and

witness bought of Cottle a 44-caliber pistol and the next day gave it to Jay Hicks, and after dinner all three—Robert, Jay, and witness—started on horseback for Myers' place. Reaching there they found "the old man" in the corral, feeding cattle. It was then "just getting dark." All went into the house for the purpose, as talked, of getting some supper. After eating, and while the deceased was in the act of clearing away the dishes, Jay Hicks spoke to him, and made "a whistling kind of sound." The old man turned around, and, seeing the gun pointed at him, said, "Oh, my God, what does this mean?" At that instant Jay Hicks fired, the old man fell to the floor, and the light, which was a kerosene lamp, went out. That witness then tried to get out of the door, but Jay, as witness testifies, "ran the gun against my belly (it was all dark), and pulled the gun off," setting witness' clothing on fire, the bullett passing through his clothes. Witness and Robert having gone out of the door, Jay came out, and called them back. On returning, they found the old man "scrambling as though he had about come to himself, and was trying to get up off the floor." Witness lit the lamp, and Robert took the old man's pocket-book from his pocket. It contained a $20 bill, a $10 bill, and a $5 bill, and a note,—"a piece of paper with some writing on it," —which he threw on the floor. Jay held the gun to the old man's head, and told him if he didn't tell where his money was he would blow his brains out. The old man insisted that he had just bought a mowing machine, and had loaned Jim Bard $300, and that he didn't have any more. "Just at that, he shot him, and the old man kind o' dropped his head." They then got coals out of the stove, piled wood on it, and sprinkled kerosene over it all, and left. That, finding it difficult to make their way back in the dark, they went into the timber, built a fire, and stayed until morning, when they returned on horseback to Martha Hicks' house, where Jay and Robert lived, sent their horses to the stable, and after breakfast witness took his horse and went home. He further testified that afterwards,

and just before their arrest, Jay told witness that there was talk of their being arrested for the murder of Myers, and "wanted to fix up an excuse about playing cards" at witness' home on the night of the murder, "He said we would all tell them, when arrested, that we had a game of cards Thursday night at my place, and that my wife seen us playing, and that Robert Walker player with us, so as to have them for witnesses, and that I was to claim to have started into the game with the gun, and lose nine dollars and the gun, and that he had the chips and was winner, and gave me a five-dollar bill and took the gun." Afterwards Jay came down to witness' house, and brought Bob (Robert Walker) with him, "and we went through the same story in the presence of Bob, so that Bob Hicks would know just what to swear to if we were arrested." Mrs. Maggie Walker, witness' wife was present. This is a fair statement of some of the salient points of the testimony of Walker, the accomplice. The corpus delicti is not disputed.

From the testimony of other witnesses, claimed by the state to be corroborative of the accomplice Walker, we notice the following: A witness, Frank Cottle, testified, in behalf of the state, that the defendants Jay Hicks, Robert Hicks and one James Hicks; a brother of Jay Hicks, came to his store about the 8th of December, 1893, and inquired for a Colt's six-shooter revolver; that Jay Hicks made the inquiry; that he asked the price of the revolver, and, after being told, wanted to know if Cottle would accept seven dollars for it, and allow him to pay the balance (seven dollars) in about two weeks or less; that he was told by Cottle that he could not have the revolver on those terms; that, after a short pause he renewed the request, and was again refused; that the revolver he examined was a Colt's frontier pistol, 44 caliber. The witness identified one of the defendants as Jay Hicks, to whom he referred. The witness was then shown the revolver, which Sheriff Beaver testified that he took from the defendant Jay Hicks at the time of his

arrest, and identified it as the revolver which Hicks had desired to purchase on the 8th of December,—as the identical revolver which witness afterwards, on the 13th of December, sold to William C. Walker. This witness further testified that on the 13th day of December, 1893, William C. Walker and Robert Hicks came into his store, and that William C. Walker looked into the show case, and asked him if he "had that six-shooter yet," priced the revolver, and said he would take it; that he did take it, and paid the money for it, and bought two boxes of Winchester 44 caliber, or Colt's 44 six shooter, cartridges. The sheriff of Meade county, Valentine M. Beaver, was shown this same pistol when on the witness stand, and identified it as the identical pistol which he found upon the person of the defendant Jay Hicks at the time of his arrest. Dr. Ira Sanderson testified that he was out to the ranch belonging to the deceased about the 16th of December, 1893, when the coroner held an inquest, and, in describing the appearance of the place, he testified that there had been an attempt to make a fire on the floor; coal had been taken from the stove, and emptied upon the floor, and small pieces of wood put upon it, and coal oil upon that, and that was partially burned;" that the wood was partially burned; that it was piled together as though going to make a fire; that this pile of coal and wood was near the feet of the deceased; that there was an empty coal oil can, or nearly empty, standing by; that there was evidence of coal oil upon the wood and upon the floor, also upon the clothing of the deceased; that there was a lamp standing upon the table with the oil all burned out, and that there were three tin plates,—two on the table and one on the floor; one at either end of the table, and one overturned on the floor. This witness also testified that in making a post-mortem examination he took from the person of the deceased a "ball found in his clothing, having passed through the body." He produced and identified the ball, and said it was "a 44 Winchester model." He also produced the fragments of another ball of the same size and character, which he said he

took from the skull or brain of the deceased.    Theodore Acker-
man, who appears to have been the first person who saw
Meyers after the night of his death, testified to finding "a burn-
ed place on the floor" of the cabin, and "firewood put straight
to the feet" of the deceased, and that the place smelled strongly
of coal oil.    This was on the evening of the 18th of December.
James K. Bard, who went to the cabin with the sheriff, coroner,
and Dr. Sanderson later on the same day, testified to finding a
note of $300, which he had given to deceased, and other papers,
like memoranda, on the floor of the cabin near the body of the
deceased.    Different witnesses swear to seeing three men on
horseback, in the early morning after the murder, going in the
direction and along the route described by Walker.    Maggie
Walker, the wife of William C. Walker, the accomplice, testi-
fied in detail to the conversation at her home between Jay
Hicks, Robert Hicks and William C. Walker when it was agreed
that they should all testify, if defendants were arrested, that
they were playing cards at Walker's home during the night of
the murder, and that Jay Hicks won the pistol at such playing.
She also testified to finding a small hole and burnt place in her
husband's clothing after the night of the murder.    The credi-
bility of her testimony was attacked on the ground that she
had previously, at the preliminary examination, testified differ-
ently than at the trial, having at such examination testified to
the matters as true which, upon the trial, she claimed was an
untruthful story made up as above described, to shield the de-
fendants and her husband.    It was, however, for the jury to
decide which of her statements, if either, or how much of eith-
er, if any, they would accept as true.    Without referring to
other particulars in which it is claimed by the state that the ev-
idence of the accomplice was corroborated, as required by the
statute, we have no hesitation in holding that the testimony al-
ready referred to was entirely sufficient to meet the require-
ments of the law, in tending to connect the defendants with the
commission of the offense.    There can be no doubt that Meyers

was killed by bullets shot from a gun or pistol. Walker swears that Jay Hicks shot him with a pistol purchased of Cottle by him, and delivered to Jay Hicks. Sheriff Beaver swears that, when he arrested Jay Hicks, he took from him a pistol. The pistol is brought into court, and by Cottle identified as the same one sold by him to Walker. The bullets taken from the body of the deceased by Dr. Sanderson were the same in size and character as would fit and be discharged from that pistol. Walker swears that immediately after the killing they attempted to build a fire on the floor of the cabin, explaining how it was done. Dr. Sanderson and Ackerman testify to such a condition of the cabin and floor as would render Walker's story probable. He testified that, after taking the money from Meyer's pocketbook they threw other papers found therein, one having the appearance of a note, on the floor. Bard testified to finding a note for $300 on the floor. Walker testified to having his clothing shot through and burned by Jay Hicks in the dark. Maggie Walker testified to finding the hole and burnt place in her husband's clothing. Walker testified that after remaining in the timber through the night, they returned in the morning on their horses. Several witnesses saw three men on horseback, at a time and upon a route which would correspond with the testimony of Walker. Walker testified that, after the murder, the three defendants, at Walker's home, and in the presence of Walker's wife, made up a story, and agreed to swear, if called upon, that they spent the night of the murder at Walker's home playing cards, and that Jay Hicks won the pistol in the game from William Walker. In this he is sustained by the testimony of the wife, Maggie Walker.

But we do not believe it important or desirable to pursue this inquiry further. Realizing the gravity of this case, and the serious issues hanging upon our decision, we have carefully read and re-read every word of the testimony, and have examined every authority cited by plaintiffs in error, with the exception of two now available to us, and we have found no case

or authority which we think would justify us in holding the point of error well taken as to the insufficiency of the corroborative evidence. In the following cases, which we find without special search, evidence which seems to us much less significant and persuasive in its tendency "to connect the defendants with the commission of the offense" was held sufficient to protect the verdict against successful attack on the ground of the insufficiency of the corroborative evidence: Malachi v. State, 89 Ala., 134, 8 South, 104, though reversed for erroneous instructions in other respects; State v. Thornton, 26 Iowa 79; State v. Allen, 57 Iowa, 431, 10 N. W. 805; State v. Townsend (Or.) 23 Pac. 968; State v. VanWinkle (Iowa) 45 N. W. 388.

Plaintiffs in error base an assignment of error on the refusal of the court to give an instruction, a part of which is as follows: "The purpose of the statute of this state upon this subject is to prohibit a conviction unless there is some evidence, entirely exclusive of that of the accomplice, which of itself, and without the aid of that of the accomplice, establishes the guilt of the defendants beyond reasonable doubt." While we have carefully examined counsel's authorities, and diligently looked for others, it has not been with the expectation of finding any case supporting this proposition. We should be disappointed to find one, and we have not been disappointed. The authorities already cited in this opinion sustain the trial court in its refusal of such instruction.

It would be of no profit to those interested in this case, or to the profession, to examine in detail the other instructions refused. We think they nearly, and perhaps quite, all state the law correctly, but not more correctly or clearly or fairly than the instructions which were given by the court itself. To refuse an instruction, however sound or well expressed, already substantially and fairly given, is not error. We are entirely satisfied that the record before us presents no reason for reversing this judgment of conviction, and the same is affirmed. The

case is remanded to the circuit court of Meade county, with directions to carry the judgment into effect according to law. All the judges concur.