STATE OF IOWA, Appellee, v. WILLIAM KURTZ, Appellant.

CRIMINAL LAW: Accomplices in Crime of Incest. A 16-year old
1    daughter is, under the record, held to be an accomplice with her
     father in the crime of incest.

INCEST: Duty of Court and Jury as to Corroboration. The exist-
2    ence of corroborating evidence is a question for the court; the
     sufficiency thereof, for the jury.

CRIMINAL LAW: Existence and Sufficiency of Corroboration. Cor-
3    .roboration of an accomplice may consist of a failure of the ac-
     cused to deny his guilt when openly accused thereof, by con-
     duct impliedly admitting his guilt and inconsistent with inno-
     cence.

CRIMINAL LAW: Spectacular Conduct of County Attorney. It is
4    not necessarily reversible error for a county attorney to sud-
     denly appear before the jury with a 22-day-old infant in his
     arms, to hand the child to the prosecuting witness, and to have
     the witness *identify* the child, and testify to its *paternity*.

**INCEST:** Weight and Sufficiency of Evidence. Evidence reviewed, and held sufficient to sustain a verdict of "guilty of incest."

*Appeal from Butler District Court.*—M. F. EDWARDS, Judge.

DECEMBER 11, 1917.

REHEARING DENIED APRIL 4, 1918.

THE defendant appeals from a conviction on a charge of incest. The facts are fully stated in the opinion.— *Affirmed.*

*W. T. Evans* and *F. J. McGreevy,* for appellant.

*H. M. Havner,* Attorney General, *F. C. Davidson,* Assistant Attorney General, and *W. C. Shepard,* County Attorney, for appellee.

STEVENS, J.—I. The defendant, who is a man somewhat past middle life, was indicted upon a complaint charging him with the crime of incest, committed with his sixteen-year-old daughter. Upon the trial, she testified that illicit relations between them had existed for about a year prior to Easter Sunday, 1916, on which latter date the last act of intercourse took place, and she became pregnant. This is the date upon which the State elected to rely for conviction. No other witness testified to any act or circumstance from which the alleged relationship could be directly inferred.

The defendant's family, besides himself, consisted of his wife, a son, Willie, about 20 years of age, Glenn and Viola, aged 11 and 5 respectively, Gladys, who was married, and at the time in question, did not reside at home, and Henrietta, 16 years of age. The father and mother occupied a bedroom on the first floor, and the children slept in one room on the second floor of their residence. Henrietta, the daughter, testified that she and her father had illicit relations whenever the mother went to the neighbors' or for

groceries. The record does not disclose where or at what time the act of intercourse took place on Easter Sunday.

Numerous errors are alleged by counsel for appellant, who apparently rely, however, principally upon the following: (1) That Henrietta was an accomplice in the crime, and that her testimony was not sufficiently corroborated to justify a conviction. (2) Prejudicial misconduct on the part of the county attorney during the trial. (3) That the verdict of the jury is not sustained by the evidence.

Henrietta, who alone testified to the criminal acts, was an accomplice, and, without corroboration, her testimony was insufficient to convict the defendant. It was not necessary that the corroborating testimony

**1. CRIMINAL LAW: accomplices in crime of incest.** relate to all the details of plaintiff's testimony. *State v. Waters*, 132 Iowa 481; *State v. Jones*, 115 Iowa 113; *State v. Duncan*, 158 Iowa 652.

Whether there was any corroborating testimony was a question of law for the court, but the sufficiency thereof was a question of fact for the jury. *State v. Waters*, supra; *State v. Baker*, 106 Iowa 99; *State v. Brick-*

**2. INCEST: duty of court and jury as to corroboration.** *er*, 135 Iowa 343; *State v. Hogan*, 145 Iowa 352; *State v. Dudley*, 147 Iowa 645.

The evidence relied upon as corroborating the testimony of Henrietta, as tending to connect defendant with the commission of the crime, is that when, in October, 1916, Mrs. Kurtz informed him that Henrietta was pregnant, for which he was responsible, he

**3. CRIMINAL LAW: existence and sufficiency of corroboration.** made no reply. When accused by his wife upon a former occasion, his reply was, "Don't set me crazy." On the occasion of the first conversation referred to, Henrietta and some of the other children were present. Henrietta was crying, and she testified upon the trial:

"I was crying because he was scolding me that I had

told ma about it,—that I was in the family way. I had told ma at that time."

A couple of days after this conversation, he went in his automobile with his son to a neighbor's, where Gladys was working, got her, and the three went to Parkersburg, where the defendant took the train, and was next heard from at some point in New York. The defendant testified that he detected something unusual in his coffee and food at the breakfast table, the morning he left home, following which he became sick, and threw up his breakfast; that he then asked for his good suit of clothes, directed Willie to get the car ready, and they went, as above stated, to Parkersburg, where he took the train, as claimed by the other witnesses. The defendant further testified that he left home because he and his wife were having trouble, and he wanted to go to New York to visit his brother, whom he had not seen for about 22 years. The record does not disclose that, before going away, he made any arrangements for the disposition or care of his family or property while absent. Willie testified that defendant did not state why he was going to Parkersburg until they had crossed the railroad track going into town, when he told them he was going to New York, and wouldn't be back until it was all over, and that, if he didn't go away, ma would put him in the penitentiary—he was sure of that. Gladys testified that he requested them not to tell Mrs. Kurtz until they heard from him, but requested them to tell her to take Henrietta to a doctor at Ackley, for the evident purpose of having an abortion performed; that he further stated to her that, if he did not go away, his wife would put him in the penitentiary. Shortly after his arrival in New York, he wrote a postal card to Willie, stating that he had not yet been able to locate his brother, and later, a nephew wrote, stating that defendant was at his brother's home. On November 4th

following, he voluntarily returned home, and was immediately arrested upon the charge of incest.

The court submitted the question of the sufficiency of the corroborating evidence to the jury, under proper instructions, and we think that there was ample evidence to justify the submission thereof. The court also instructed the jury upon the question of flight, and the effect to be given the evidence which the State claimed established flight.

II. The alleged misconduct on the part of the county attorney consisted in leaving the court room while Henrietta was on the stand, and returning, shortly thereafter, with her baby, which was, at the time, twenty-two days old, in his arms, and in handing the same to her, and propounding the following questions, with the answers shown.

4. CRIMINAL LAW: spectacular conduct of county attorney.

"Q. Henrietta, is the baby that you now have in your hands your baby? A. Yes, sir. Q. And who is its father? A. My father."

Counsel for defendant at the time objected to the conduct of the county attorney in going from the court room and returning with the infant in his arms and placing the same in the hands of the prosecuting witness. The court's attention was called particularly to the fact that such conduct was prejudicial to the defendant; that the conduct of the county attorney was spectacular, purely for effect, and to create prejudice against the defendant. To this the county attorney responded that he only desired to identify the child and its paternity, and that he brought it in for no other purpose.

Attached to defendant's motion for a new trial was the affidavit of the defendant, in which the above matters are recited, with the further statement that the child was so held that the jury could see it. Upon the oral argument in this court, counsel for defendant claimed that the de-

fendant had black hair, as did also the child, and that the emphasis by this conduct of' the apparent resemblance in this respect was necessarily prejudicial to the defendant. No cautionary instruction was requested or given to the jury by the court regarding this occurrence.

No claim is made that the prosecuting attorney in any way referred to this incident during the trial. The testimony elicited by the questions propounded was clearly admissible. The fact that she had given birth to a child corroborated her claim as to the fact of intercourse. The only conduct, if any, on the part of the county attorney subject to criticism is the manner in which he brought the child into the court room and handed it to its mother. Naturally, the appearance of the county attorney coming from another room in the courthouse bearing this small infant in his arms would attract the attention of the jury and bystanders, and very likely cause some confusion. When counsel for appellant protested against the conduct of the county attorney, he frankly stated to the court that he desired only to prove the identity and paternity of the child. It would not have been error for the mother to have held the child in her arms while giving her testimony. Had she done so, the jury would have had equal opportunity to observe any resemblance between the child and the defendant. The possible resemblance of the child to defendant does not appear to have been the subject of comment at any time by the county attorney, nor was this subject referred to during the trial. The prosecuting attorney

5. INCEST: weight and sufficiency of evidence.

should always avoid conduct spectacular in character, or such as would excite or cause a demonstration prejudicial to the defendant; but the record in this case does not disclose such prejudicial misconduct on his part as to necessitate a reversal. Whether the defendant was the father of the child or not, his relationship to it was such that a resemblance would

be quite likely. The authorities cited by counsel for appellant dealt with conduct upon the part of the prosecuting attorney quite different from that here complained of. The errors pointed out in the cited cases were apparent.

III. It is also argued by counsel for appellant that the evidence is insufficient to sustain the verdict. It is earnestly contended that the wife and children of defendant conspired together to charge him with this offense. From the evidence, we infer that the defendant and his wife have not lived very happily together, and that he, some years ago, accused her of improper relations with two different men. He claims that she made some admission touching these matters, but she denied, upon the witness stand, having done so, or that she had ever been guilty of wrongdoing. None of the witnesses, apparently, were very intelligent, and the mother manifested rather unusual indifference to the shame and disgrace that had fallen upon her family; but there is little or nothing from which a corrupt purpose on her part or that of the children to wrongfully accuse defendant of crime can be inferred. The defendant did not, when accused, in her presence and that of the other children, of being the author of his daughter's misfortune, deny the same, and made no response thereto. It is not shown that Henrietta kept company with young men, or that she was much of the time away from home. It does appear, however, that she occupied the same bedroom with her brother Willie and the other children, but she and Willie both deny having had illicit relations at any time.

Willie further testified that defendant at one time accused him of being responsible for his sister's condition, but that he promptly denied his guilt to his father. Evidence was offered tending to show that Gladys was not possessed of a good reputation before her marriage, and that her husband obtained a divorce from her on the ground of adultery. She, however, testified that she did not know upon what

ground the divorce was granted. No witness testified to any admission of guilt on the part of the defendant. Several of his neighbors testified that, prior to the accusations made against him by his daughter, he had borne a good reputation in the community for chastity and moral character. The defendant testified that he attended Sunday school, and was, for a period of six years, superintendent thereof. For the purpose of showing a bad motive on the part of his daughter for this prosecution, he testified that, one morning, probably at the breakfast table, after a dance the night before, one of the girls—but he did not remember which—stated that they could have made four or five dollars with the "fellows" the night before if they had wanted to. Both girls deny having made this or any similar statement. This testimony, in the view we take of it, could not have been helpful to the defendant. It is quite inconceivable that these young girls had fallen so far below common standards of decency or respect for parental authority or regard as to utter a statement of the character indicated in either the presence or possible hearing of the parents, and that he would offer no protest, or rebuke them therefor. So far as the record discloses, defendant said nothing to the girls, but told his wife not to have any more of that kind of fellows around, and that there would be no more dances at his house.

The evidence of Henrietta is very brief, and goes but little into detail. None of the family appears to have observed conduct on her part with the defendant which aroused their suspicion, or caused them to believe that improper relations existed; except that Mrs. Kurtz testified that she, at a time previously, accused the defendant of having ruined his daughter, when it turned out that she was mistaken in her belief that she was then pregnant. The opportunities for such relations probably frequently existed. Henrietta testified that it occurred as often as two or three

times a week, when her mother had gone visiting, or after groceries. It further appears from the record that defendant was accustomed to lie in bed until after he had eaten his breakfast; that the morning meal was usually prepared by Henrietta, and frequently Willie and Mrs. Kurtz would go to the barn to do the chores.

It was also rather remarkable that the defendant would, under the circumstances, have left his family so suddenly and gone to visit his brother, whom he had not seen for 22 years, and from whom he had not heard for more than 10 years. That he would have submitted in silence and without protest to the accusations made against him by his wife in the presence of their children, is utterly inconsistent with innocence. No father of good character and without guilt would have deported himself, under the circumstances shown in evidence, as the defendant did.

The offense charged is most revolting in character, and it is difficult to conceive the possibility of its commission; but we have searched the record thoroughly, and examined the court's instructions to make sure that the defendant had a fair trial. So far as the record discloses, he did; and, while other alleged errors are argued by counsel for appellant, we reach the conclusion that no reversible error is shown. The instructions clearly submitted the case to the jury, and the guilt of defendant is quite satisfactorily established.

The judgment of the lower court is—*Affirmed.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.