J. A. HENDERSON, Appellant, v. HARRY I. BALL, Appellee.

**FRAUD: Jury Question.** Evidence held to present a jury question on the issue of fraud in the sale of cattle.

**EVIDENCE: Presumptions—Failure to Testify.** A presumption unfavorable to a pleaded defense may very properly be drawn from the failure of a defendant to testify to matters as to which he has exclusive knowledge.

**FRAUD: Other Offenses—Attempt to Exclude by Plea.** In actions for fraud, other similar and nonremote acts of the accused are admissible on the issue of intent, notwithstanding defendant's attempt to exclude such by the plea that whatever was said and done by him was said and done *designedly and knowingly*.

*Appeal from Jefferson District Court.*—SENECA CORNELL, Judge.

FEBRUARY 7, 1922.

REHEARING DENIED MAY 8, 1922.

ACTION at law, to recover damages on account of alleged fraud in the sale of cattle. There was a directed verdict for the defendant, and plaintiff appeals.—*Reversed.*

*E. F. Simmons* and *Thoma & Thoma,* for appellant.

*R. C. Leggett, Starr & Jordan, Jaques, Tisdale & Jaques,* and *Walker & McBeth,* for appellee.

WEAVER, J.—The pleadings in this case are multifarious and confusing. The original petition is not set out in the abstract, but appears to have sought a recovery of damages for

1. FRAUD: jury question.

fraud and deceit practiced upon plaintiff by the defendant in the sale of cattle. This was followed by an amended and substituted petition in two counts. In the first count, recovery of damages was sought for defendant's breach of an alleged warranty or guaranty of the weights, quality, and kind of cattle sold to the plaintiff. In the second count, plaintiff charged that defendant, with others, was engaged in a general plan or scheme by which to sell and dispose of cattle of very inferior grade and quality, by advertising and representing them to be of choice quality and of much greater weight and value than they in truth had; that, in pursuance of such general fraudulent purpose, defendant led the plaintiff to come to Iowa from his home in Alabama, and by cunning and fraudulent practices induced him to purchase about 243 head of cattle, on the representation and guaranty that 93 of the animals would weigh an average of 800 pounds each, and the remainder of them an average of 600 pounds each, all of which warranties, representations, and guaranties the plaintiff believed and relied upon, in making said purchase, and paying therefor the sum of $14,450; but that, in truth and in fact, said cattle were not as represented, were of much lighter weight,

poorer quality, and inferior value, whereby plaintiff sustained great loss and damages. Many of the allegations in the first count were stricken out on motion of the defendant; but in view of subsequent proceedings, we think the ruling in that respect is not now open to review.

By a further amendment, the claim set up in Count 2 of the substituted petition is restated in greater detail, but without material change in substance. The defendant, having answered, taking issue on the plaintiff's allegations of misrepresentation, fraud, and breach of warranty on his part, alleges that the cattle sold to defendant were actually delivered to him on the cars at the local railway station, and that thereafter defendant neither had nor assumed any other or further responsibility for the property so purchased by plaintiff. Upon the issues so joined, trial to a jury was begun. Pending the introduction of evidence, defendant filed an amendment to his answer as follows:

"Now comes the defendant, and for an amendment to his answer says: That whatever statements or representations are or will be shown by the evidence to have been made by the defendant, if any, and which are contained in the pleadings in this case, were designedly made, and that they and each of them were not accidental or unintentionally made, or through any inadvertence; and that whatever the defendant did or said in respect thereto, if anything, he did and said knowingly."

Still pending the introduction of testimony, the plaintiff amended his petition "in order to conform to the evidence." This amendment is known in the record as Count 3. It reasserts the former charge of a general fraudulent scheme to defraud purchasers of cattle by making use of false and misleading advertising and private correspondence, to lure strangers living at a distance into the purchase of cattle described as being of choice quality and of a weight, kind, and character to make them desirable to live stock dealers and feeders, and then by cunning and fraudulent practices to deliver or ship to the purchasers other cattle of inferior quality, of lighter weight, and of less value than had been offered or represented or warranted by him. It was further alleged in this count that, in furtherance of such fraudulent scheme, defendant published an adver-

tisement in the National Live Stock Reporter, at East St. Louis, in Illinois, giving notice to purchasers as follows:

"256 Hereford, Angus, and Shorthorn Steers for sale. Weight 600 to 1,050 lbs. Choice quality. If interested, write your wants. Harry I. Ball, Fairfield, Iowa."

Plaintiff further states that, his attention being attracted to this notice, he wired defendant from Troy, Alabama, on January 22, 1919, asking him:

"At what price can you deliver 4 cars of 8 hundred pound average feeder cattle delivered Troy, Ala. Wire freight rate."

To this inquiry defendant responded under same date, as follows:

"Fairfield, Iowa, Jan. 22, 1919. J. A. Henderson, Troy, Ala. Choice quality Hereford wide backs dark red full white faces three quarters full bloods worth around eight fifty here or nine cents delivered freight about fifty cents on stock cattle wire my expense if you can come cattle must be sold on account of feed. H. I. Ball."

Thereupon, it is alleged, plaintiff went to Fairfield and met the defendant, who took him to his home and entertained him there while he remained in town. Defendant drove with plaintiff to several places in the neighboring country, and showed him several bunches of cattle. The first animals shown were black, and plaintiff declined to consider them, saying that he wanted Herefords, or "white faces." They next inspected a bunch of 93 head, which plaintiff also at first refused to buy, because they were too small. They then visited a third bunch of 140 head, which appeared to be more satisfactory, and plaintiff agreed to take them at $70 per head, the defendant guaranteeing (according to plaintiff) that these steers would average 800 pounds each. Agreement having been reached as to the last described steers, negotiation was reopened for sale of the 93 head above mentioned, and plaintiff took them at $50 per head, the defendant (as plaintiff asserts) guaranteeing their weight at an average of 600 pounds. Two other persons, apparently employees of the defendant, drove the cattle toward the railway station. It was then approaching night, and the train which would take the shipment would not go out until early the next morning. The

cattle were put into yards at the station, but whether loaded that evening or not until early the next morning is the subject of dispute, as is the further fact whether and to what extent plaintiff saw or took part in such loading. When the cattle were brought to the station, the cars had to be moved or hauled into proper position, and the business with the station agent required more or less attention. Plaintiff further alleges that, in looking at the cattle before and at the time of their purchase, he was in the carriage with defendant, who kept him at considerable distance from the herd, which was kept moving about, so that he could not give them close or critical examination; and that, after their arrival at the station, it was too dark for such purpose; but that he relied upon the good faith of defendant, and upon his guaranty as to the weight and quality of the steers. He further charges that, in truth and fact, the cattle actually loaded into the cars and shipped to him at Troy, Alabama, were other and different than those shown to him by the defendant, and were not the cattle he had purchased, but other and different animals, of inferior quality and less valuable than those which had been shown him,—all to his great loss and damage.

On the filing of this amendment, defendant moved to strike the same, as setting up a new cause of action, and as being inconsistent with the cause of action on which the suit was first brought. This motion to strike was overruled, but was amended and renewed on the following morning. The court again overruled the motion, but on defendant's demand, required the plaintiff to elect whether to proceed with the trial upon his claim as set out in the first and second counts of his amended and substituted petition, or to proceed in sole reliance upon the claim stated in the amendment, or so-called third count. It was also ordered that, if plaintiff elected to proceed in reliance upon said third count, defendant would be entitled to take a continuance. Plaintiff elected to go on with the trial upon his claim as stated in the third count; and defendant, having taken issue upon said count, waived his right to a continuance, and the trial proceeded to a termination. At the close of the testimony on both sides, the court sustained defendant's motion for a directed verdict in his favor.

I. It will be seen that, notwithstanding the protracted struggle in pleading and in the conduct of the trial, the sole issue left in the case, when ready for submission, was the one joined on the third count or amendment to the petition; and the one decisive question raised by this appeal is whether there was evidence introduced or offered in support of the claim so asserted upon which plaintiff was entitled to go to the jury. To a fair understanding of the case in this respect, it is necessary to refer in brief outline to the testimony. As we have already noted, it is the theory and the allegation of the third count of the petition that defendant was engaged in a scheme to defraud buyers of cattle by a course of seductive advertising and fraudulent misrepresentations, planned especially to obtain unfair advantage of strangers at a distance, desiring to purchase cattle; that, in pursuance of that plan, defendant got into communication with plaintiff, a resident of Alabama, and by a series of crafty devices and false representations and guaranties induced him to purchase a large number of cattle; but that, instead of delivering the animals exhibited and sold to him, or delivering others of like description and value, he substituted cattle inferior in quality, lighter in weight, and of less value. In support of this claim and of the allegation of fraudulent intent on the part of defendant, plaintiff offered the testimony of one Wade, a resident of Illinois, to the effect that, in January, 1919, he was brought into communication with defendant through the advertising of the latter; and that, with a neighbor or friend, he came to Iowa and saw defendant, and told him they wanted to buy cattle weighing about 600 pounds, and arranged to buy from him 40 head, which he warranted would weigh that amount. Witness examined the cattle so offered, and said that in his judgment they would weigh 600 pounds each; but when defendant produced cattle in professed fulfillment of the sale, they proved to be other and different animals, not averaging more than 300 pounds. The witness objecting to such cattle, defendant then undertook to obtain or substitute others in their place, and exhibited to the witness other cattle, which would in fact weigh 800 pounds; but the cattle which defendant afterwards produced for that purpose also proved to be other and different

animals, which would not weigh to exceed 550 pounds. Another witness, one Grismore, a resident of Ohio, offered to testify that, in February, 1919, his attention was attracted by the advertisement of one Carrow, of Ottumwa, Iowa, offering feeder stock for sale. Witness thereupon came to Iowa, and found Carrow, who took him to the defendant, Ball. Witness wanted to buy cattle which would weigh from 1,000 to 1,100 pounds each, and defendant showed him some of that description, and undertook to sell them to witness on guaranteed weight of 1,100 pounds; but the cattle offered or delivered by defendant at the railway station were not those he had sold the witness, but greatly inferior thereto. Substantially like testimony was offered by one Ruff, also of Ohio. So, also, one Hamman, of Ohio, would testify that he was led into communication with defendant through the man Carrow, substantially as described in the case of the witness Grismore; that defendant took him in and entertained him, and showed him a splendid grade of cattle, which would weigh more than 900 pounds each, and arranged to sell them to the witness; but the cattle delivered at the station were other and different, and very much inferior to those which defendant had professed to sell to him. Still another of the offered witnesses, one Flint, a resident of Rhode Island, also saw one of defendant's advertisements, and entered into correspondence with him. Defendant described and offered to sell him a lot of steers as "two-year-old Herefords," "very choice quality," "every one with full white face," "all dehorned," would not average quite 700 pounds. Witness bought the cattle from defendant's description of them. When received in Rhode Island, the stock, instead of being all two years old, included 30 yearlings; and instead of all being dehorned, 15 of them had horns. They did not average "quite 700 pounds," but averaged 464 pounds; and instead of being all healthy, several had tuberculosis.

The testimony of each and all of these witnesses was excluded by the trial court, on the defendant's objection that the matter so offered was immaterial, irrelevant, and incompetent. Before entering upon the discussion here suggested, it is proper to recall another matter or two, more immediately connected with the deal between plaintiff and defendant. The shipment of

cattle to plaintiff on its arrival in Alabama included 221 head, 12 having died on the road. They were a mixed lot, red, spotted, black, white and black, and a "whole lot with horns." 21 died within a week after being unloaded. There were four bulls in the lot. In weight they averaged less than 500 pounds. Counsel for appellee, in argument in this court, concede that the evidence upon this point is such that the jury could have found that the cattle delivered by the carrier to the plaintiff at Troy, Alabama, were "*not* the same cattle plaintiff purchased on the Joe Ball farm," but argue that this fact is without significance, because there is no evidence as to when or where or by whom the change was made. This, we think, is hardly a sufficient reason for disregarding the evidence of the apparent or alleged fact that the cattle delivered to the plaintiff in Alabama were not the same as those which defendant had undertaken to sell to plaintiff. There was evidence from which the jury could have found that the loading of the cattle was done or looked after by the defendant and his brother and their employees, and that the shipment was made in the name of the defendant. There is some confusion among the witnesses on the question whether the cars were loaded in the evening after supper or early the following morning. The train time out of Fairfield was 6:30 A. M. No caretaker accompanied the shipment. The negotiations had were between plaintiff and defendant only; and somewhat strange to say, neither the defendant nor his brother Joe (who is now said to have been the real owner of the stock) took the witness stand on the trial; and in so far as plaintiff states the conversation between him and the defendant, or the terms and conditions of the deal, or testifies to the representations made to him by defendant, there is no denial or dispute, except the denials in the pleadings. No one could speak with the certainty of personal knowledge of the identity, character, and description of the cattle defendant professed to sell, or of their identity with the cattle loaded upon the train, or their identity or lack of identity with the cattle delivered to the plaintiff at the end of the transportation in Alabama, except the defendant and his brother; and when it appears, as counsel concede, that the jury could have found that the animals delivered at Troy, Alabama,

were not the same which plaintiff purchased on the Joe Ball
farm in Iowa, it is by no means a conclusive answer to plaintiff's
charge of fraud in that connection to say that, if there was a
change by which another and inferior lot of cattle were delivered
in Alabama or wrongfully substituted for those bought by plain-
tiff on the Joe Ball farm in Iowa, there is no evidence that de-
fendant was in any manner responsible for it. He is the man
who made the sale on the Joe Ball farm. He is the man who
made the shipment in his own name. There is no evidence or
testimony tending to show the possibility of a substitution of ·
an inferior lot of cattle while the shipment was en route be-
tween Iowa and Alabama. If a substitution was made by any-
one anywhere, it is the natural conclusion that
it was accomplished between the time when the
agreement of sale was made on the Joe Ball

2. EVIDENCE: pre-
sumptions: fail-
ure to testify.

farm and the departure of the loaded cars from Fairfield, Iowa.
In the absence of evidence to the contrary, there is a presump-
tion that the shipment received at Troy, Alabama, is the iden-
tical one which defendant and his brother delivered to the
railway company. The withholding of the testimony of defend-
ant and his brother, who, as we have already said, are the only
persons other than plaintiff who could speak from personal
knowledge of the terms of the sale, of the representations or
guaranties, if any, and of the identity of the cattle so sold with
those shipped out from Fairfield, Iowa, to Troy, Alabama, is a
circumstance from which the jury could rightfully draw infer-
ences unfavorable to the defense. *Green v. Brooks,* 215 Pa. 492
(64 Atl. 672); *Abelman v. Haehnel,* 57 Ind. App. 15 (103 N.
E. 869); *Howe v. Howe,* 199 Mass. 598 (85 N. E. 945); *Atchison,
T. & S. F. R. Co. v. Davis,* 26 Okla. 359 (109 Pac. 551); 22
Corpus Juris 111, and Notes 50 to 54.

If, in this connection, we must also hold that the testimony
of the several witnesses to other alleged similar transactions
ruled out by the trial court should have been received, it fol-
lows of necessity that a reversal of judgment
appealed from must be ordered. That the evi-
dence was admissible, as bearing upon the ques-

3. FRAUD: other of-
fenses: attempt
to exclude by
plea.

tion of fraudulent intent of the defendant in the deal with the

plaintiff, we are quite satisfied. Fraud is not to be presumed, and its proof involves the necessity of showing facts justifying a finding of a wrongful intent. In the nature of things, proof of the intent is difficult, except as it is fairly inferable from the conduct of the party charged with the wrong. The jury are the judges of the weight and credibility of evidence; and if the circumstances shown are such that reasonable and fair-minded jurors may fairly believe therefrom that the truth of the charge has been established, then the court cannot properly interfere with the verdict. As bearing upon the question of intent, it is a well established rule that evidence is admissible of other similar acts of the accused in his dealings with others at or about the same time, and in connection with transactions of the same general character. *Starr Bros. v. Stevenson*, 91 Iowa 684, 687; *First Nat. Bank v. Wise*, 172 Iowa 24, 27; *Porter v. Stone*, 62 Iowa 442; *McLaughlin v. Thomas*, 86 Conn. 252 (85 Atl. 370); *Stouffer v. Alford*, 114 Md. 391; *Yakima Val. Bank v. McAllister*, 37 Wash. 566, 574 (79 Pac. 1119); *Mudsill Min. Co. v. Watrous*, 61 Fed. 163, 180; *Cook v. Perry*, 43 Mich. 623, 627 (5 N. W. 1054); *Exchange Bank v. Moss*, 149 Fed. 340, 343; *State v. Brady*, 100 Iowa 191, 196.

In principle, quite like the present case is *Eastman v. Premo*, 49 Vt. 355, where plaintiff charged defendant with fraud in the purchase of horses, and it was held permissible to show that, about the same time, defendant was engaged in other similar alleged frauds in the purchase of horses from third persons. The court there says:

"For the purpose of showing the defendant's intent, we think the evidence admissible. Upon this view of the alleged purchase, the defendant's fraudulent intent is a material fact to be made out; and in such case, collateral transactions may be shown, to establish such intent."

We can see no reason why the evidence of this character offered by the plaintiff was not both material and competent. It was certainly not irrelevant, for it was addressed to the very matter which plaintiff had alleged in the third count of the petition,—allegations which the court had refused to strike out, and upon which the defendant had joined issue by denial.

The assignment of error upon the exclusion of the plaintiff's offered testimony must be sustained.

At this point as well as at any other, we may properly refer to the amended allegation by the defendant that:

"Whatever statements or representations are or will be shown to have been made by the defendant, if any, and which are contained in the pleadings, were designedly made, were not accidental or intentionally made, or through any inadvertence, and that whatever defendant did or said in respect thereto, if anything, he did and said knowingly."

It is the contention of appellee that this allegation or admission has the effect to render immaterial and inadmissible any evidence to prove fraudulent intent. That there is one decision, and perhaps two, by this court in the past, affording some support for this argument, may be admitted; but those precedents have since been expressly disapproved and overruled. See *State v. Kappen*, 191 Iowa 19. A hypothetical admission of that nature will not preclude the other party from proving the wrongful intent in the usual manner by other competent testimony.

II. Counsel on both sides have given very considerable attention to the subject of election of remedies, as well as to the matter of claiming two or more inconsistent rights of action in the same suit. These are questions which do not seem to be involved in this appeal. As we have before noted, the issues tried to the jury had been narrowed down by the rulings of the court and acquiescence of the parties therein to the claim pleaded in the third count of the petition and answer thereto; and for reasons sufficiently expressed in this opinion, we have held that the court erred in directing a verdict for defendant. Whether there was error in the record made in the attempt to frame issues upon the first and second counts of the petition (dismissed when the parties elected to proceed to trial upon the third count) is a question we shall pass without decision and without prejudice to the rights of the parties, on remand of the cause for new trial, to recast their pleadings. Without any desire to be over-critical or captious, it must be said that it is practically impossible for us to so co-ordinate the many pleadings, amend-

ments, substitutes, motions, rulings, and orders preceding the filing of the third count of the petition as to enable us to get any satisfactory grasp of the situation until the point had been reached in the proceedings where the court cut the tangled Gordian knot by denying defendant's motion to strike said third count, and directed trial to proceed.

In reversing the judgment and remanding the cause, we suggest to the trial court the advisability of ordering the parties to simplify the record by substituting new pleadings, before taking up the labor of a new trial.

For the reasons hereinbefore stated, the judgment appealed from is reversed, and a new trial is ordered.—*Reversed and remanded.*

STEVENS, C. J., PRESTON and DE GRAFF, JJ., concur.