STATE OF IOWA, Appellee, v. WILLIAM H. COTTON, Appellant.

No. 47075.

(Reported in 33 N. W. 2d 880)

SEPTEMBER 24, 1948.

REHEARING DENIED APRIL 8, 1949.

Herrick, Sloan & Langdon, of Des Moines, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and Carroll O. Switzer, County Attorney, for appellee.

BLISS, J.—The dissenting opinion of the writer having received the concurrence of a majority of the court has become the opinion of the court.

On December 31, 1946, the Polk County Grand Jury jointly indicted the defendant and Elmer G. Croft and H. H. Thompson and accused them of obtaining money by false pretenses from said county through the issuance of its warrant for the sum of $1285.20. While the accused were indicted as principals under section 688.1, Code of 1946, it is the theory of the State that Croft was the principal actor and by his false pretenses directly procured the said warrant and the money paid thereon, and that the defendant, Cotton, aided and abetted Croft in the wrongful procurement.

All of the accused were granted separate trials. Croft was tried first. He was convicted, sentenced and committed to the penitentiary. He had previously served time for the conviction of a felony. The trial of the defendant began on the 17th of March, 1947.

Defendant took office as a member of the Polk County Board of Supervisors on January 2, 1941, and remained such until December 31, 1946. On the death of the chairman of the Board in October 1942, defendant became vice-chairman until his selection as chairman in January following. He was thereafter annually selected by the Board as its chairman, and so

served during his continuance in office. At the time of the trial he was sixty-four years old, married and the father of two married daughters. He had been active in responsible business positions and activities in Des Moines for many years prior to becoming county supervisor. Numerous reputable witnesses testified to his good repute in the community for honesty and fair dealing.

The Board of Supervisors consisted of one member from each of the five districts in the county. When defendant became chairman the members of the Board were B. B. Dewey, R. J. Hild, Charles Elson, A. C. Hitz and defendant. Later Charles E. Parmenter succeeded Hitz.

The defendant was chairman of the Polk County Board of Social Welfare during the time that he was supervisor. Mrs. Northup and supervisors Dewey and Elson were also members in 1945 and 1946. In addition to the general duties of the supervisors, each member was assigned a separate department for his particular attention. The Social Welfare Department was assigned to the defendant.

One of the committees of the Board of Supervisors was the "Purchasing and Building Committee" consisting of three members. In 1945, defendant was its chairman, and Hitz, its vice-chairman. In 1946, defendant was chairman and Elson was vice-chairman. Supervisor Dewey was a witness for the State. He testified that defendant, as its chairman, never called a meeting of the purchasing committee in 1945 or 1946. In truth and in fact every meeting of the Board of Supervisors—and they were frequent—was a meeting of that committee. By resolution in each of those years every member of the Board was a member of each and every committee. For a great many years, by custom and practice, and perhaps by resolution, any three members of the Board were an auditing committee authorized to pass upon and approve any claim presented to them at any time.

According to Mr. Linstrum, County Auditor since January 3, 1939, and in the office since June 1, 1918, it had been the custom "for many, many years * * * as long as he knew anything about it * * * back to 1920" that on claims where three members of the Board had by their signatures certified that they had audited a claim and recommended its payment, the

claimant. could at once, and without an allowance by the Board in session, go to the county auditor and get a warrant for his claim, which he could promptly cash. As shown by the testimony, "the reason for that is that when three of the members have signed their names on the back of the claims, it is known that their vote will be for the approval of the claim."

The regular meetings of the Board, the record shows, were about the first and the middle of the month. All claims filed were then brought to the Board meeting from the auditor's office. Because of these old customs roll calls on claims were superfluous. The recommendation of the auditing committee took the place of a roll call. As testified by the auditor: "It is not true that the Board at no time ever allowed or disallowed any particular claim by voting on that claim. There were exceptions. The Auditing Committee didn't want to pass on certain bills. For that reason they were taken to the Board and there was a vote taken on them."

There is no evidence in this record that the defendant initiated any of these practices or customs.

H. H. Thompson, one of the accused, had been in the employ of the Social Welfare Department for over twelve years. During the later years he was Director of Social Welfare and Overseer of the Poor. F. J. Moeckly handled accounting for the Welfare Department for about five years until he left December 31, 1944. L. J. Huss had been with the Welfare Department for over fourteen years. He was in the accounting department. When the statement or invoice of any claim came to the Welfare Department he audited it by checking or making the computations and adding the sales tax. He then filled out the printed blank requisition with the data of the claim directed to the purchasing committee of the Board of Supervisors, stapled the invoice of the claim and the requisition to a printed blank back, and sent these attached papers to the office of George F. Greenlee, who, until his death in May 1946, signed all requisitions that were required on the purchases or bills that were submitted to the supervisors for approval. On the inside of the above-mentioned printed back was the affidavit of the claimant that the account was just and true and unpaid. After the requisition had been signed by Greenlee and Thompson it was returned to Huss for

delivery to the claimant or to be messaged to the county auditor's office or to the supervisors.

Elmer G. Croft, the other accused, was an automobile mechanic who for eight years at 701 Cherry Street, Des Moines, under the name "Modern Motor Service" operated a public garage and motor-service establishment. That had been his business for over twenty-five years. Since 1934 he had the exclusive care of the motor vehicles used by the Social Welfare Department. It was his duty to keep them in running order, to repair them and furnish equipment for them. He kept them supplied with gas and oil, and furnished them storage. During these years he had a free hand in these matters—too free. He serviced the motor vehicles for the Polk county sheriff in 1945 or 1946—seven or eight cars, and for a time the cars of the Road Patrol—twenty-five or thirty of them.

For a number of years and down through the year 1942 the automobile requirements of the Welfare Department had been financed or furnished by the Community Chest. In January and February 1943 by turning in the used vehicles and by money from the Community Chest funds, five new Chevrolet sedans, one Chevrolet coupé and a Chevrolet panel truck became the property of the Social Welfare Department. Croft housed and serviced these cars and sent statements of his charges to the Welfare Department where they were handled as above noted. These cars had hard service. Most of them were used day and night. With the exception of the car used by Cotton in the performance of his services in the Welfare Department, all the cars were driven by whomsoever in the department had need for them. They were used in public service other than welfare service. The mileage on these cars on December 18, 1946 was: License No. 77-15377 (Cotton's car), 31,037 miles; No. 77-15720, 43,143 miles; No. 77-16297, 84,936 miles; No. 77-2896 (panel truck), 32,987 miles; No. 77-19411, 94,723 miles; No. 77-19248, 94,327 miles; No. 77-20129, 89,097 miles.

The claim on which the charge in the indictment was based came to the Welfare Department on March 15, 1946. How it came there is not clear. The employees there had no recollection. It would be remarkable if they had. In Croft's own trial

he testified that he mailed it to the department. In this trial he testified that he personally took it to Mr. Thompson, who after telephoning Cotton "what the bill was, and what it was for and the amount of it" signed the requisition. Thompson, who was a witness for both the State and the defendant, as the latter's witness, denied the testimony of Croft in its entirety. Thompson testified that this claim apparently came through the department in the regular routine, through Huss, Greenlee and to himself. He signed the requisition in two places. He denied that he had any communication with Cotton about this claim, Exhibit 2, on which the indictment is based, or about Exhibits 59, 60 or 61, which Croft testified he discussed with Thompson at a time when the latter discussed the matter with Cotton, by telephone.

Exhibit 2 consists of two pieces of paper and the back to. which they were fastened. The bottom sheet is claim No. 2315 of the "Modern Motor Service", an invoice dated March 15, 1946, in Croft's handwriting describing equipment for "All Cars"— that is the seven Welfare cars as follows:

"7 New complete Chevrolet motors @ $185 each · $1295.00

7 New complete Chevrolet transmissions @ $55

each 385.00
_____

$1680.00

less 25% or $420 and plus $25.20 sales tax—

total $1285.20 "

The middle sheet is the printed requisition blank bearing date of "March 15, 1946" addressed "To the Purchasing Committee, Board of Supervisors, Polk County, Iowa"—"Please order the following goods for Polk County Welfare Dep't." Then follow the words and figures of the invoice sheet. Below that is the typewritten word "Received." At the bottom are the words:

"Yours very truly, ·

Requested by Geo. F. Greenlee

(in his handwriting)

Approved by H. H. Thompson

(in his handwriting)."

On the inside of the top sheet or back of the claim is the following affidavit:

"State of Iowa, Polk County, ss:

I, Elmer G. Croft on oath do say that the above account is just and true and that the same has not been paid, or any part thereof.

[Signed] Elmer G. Croft

Subscribed and sworn to before me this 15th day of March, 1946.

Leon J. Huss,

Notary Public in and for Polk County, Iowa.

(Seal)"

On the outside of the back sheet in the printed blanks are the auditor's claim No. "1756" and warrant No. "47543." The amount of the claim "$1285.20" and claimant's name, "Modern Motor Service." Next is the auditor's rubber stamp, "Filed March 15, 1946, L. O. Linstrum, County Auditor." Next is the rubber stamp of the Welfare Department:

"Polk County Welfare Dept.

Audited: L. J. Huss [his signature]

Submitted for approval:

By Geo. F. Greenlee [his signature]

By H. H. Thompson [his signature]."

Then follows this printed certificate:

"We hereby certify that we have audited the enclosed bill and recommend payment of the amount indicated.

Date _____

Charles E. Parmenter,

R. J. Hild,

B. B. Dewey [signatures]

Auditing Committee."

"Action by Board:" Following these words are the red lead pencil initials of William H. Cotton, and then this rubber stamp:

"Allowed

March 26, 1946

William H. Cotton

Chairman Board of Supervisors."

Croft testified that after he had received the requisition and the invoice: "I brought them down to the courthouse * * * and had these three signatures put on here, Mr. Charles Parmenter,

Roy Hild, and Ben Dewey personally. I then took it in to the Auditor's office and got a check for it." This check is Exhibit 3, a Polk county warrant for $1285.20 in favor of Modern Motor Service. Croft testified that he received it on March 15, 1946 and "after I received Exhibit '3' from the County Auditor I took it out to the First National Bank of West Des Moines and got it cashed there whereby I paid some money in on a note, $500 I believe and brought the balance back with me."

The crime charged in the indictment—the corpus delicti—was fully and directly consummated by Croft on March 15, 1946. There is no direct evidence by any witness, other than Croft, that Cotton in any way aided or abetted Croft in the commission of the crime, or that he was an accessory before the fact. He was not one of the auditing committee. He did not approve or recommend the payment of the claim nor O.K. the requisition. His name was not on the papers on March 15, 1946, when Croft procured the warrant.

The Board of Supervisors was in session on March 26, 1946. At that time, in addition to passing upon several hundred claims, many other matters were considered, as appears from a type-written record of its proceedings for that day. Elson was the only absent member. The only record of the claims is this statement: "Claims as shown on the Auditor's and Supervisors' Register of claims were allowed or disallowed as endorsed each." The endorsement probably refers to the approval or disapproval of the auditing committee.

Dewey, when asked what the Board did "in the way of allowance of that exhibit and claim," testified:

"Well of course I never saw that bill after I signed it. I don't know—you can understand—I wouldn't know that because there is anywhere from three to five hundred bills go through the Board at every meeting. * * * The Board wasn't taking a roll call on the allowance of separate bills. There was no roll call on the allowance of claim 1756 [Exhibit 2] at the meeting on March 26, 1946."

With respect to that meeting of the Board, Cotton testified that he had not seen or heard of the claim Exhibit 2 prior to

March 26, 1946. Asked "what if anything, did you have to do in connection with" the claim on that day, he testified:

"Well, this bill along with several others was approved by the Board of Supervisors on March 26th, and the 'Allowed' stamp put on here by the auditor, I put my initials on here authorizing the secretary of the Board to stamp my signature on it. Q. Now, did you read that claim over on the 26th of March, 1946? A. No, that bill was in this form when I saw it along with several hundred others. I folded it up along with, and I take those bills and run through them to see if three of the Board had audited the bill as to form and as to the affidavit, as in their judgment that the bill was a just bill and O.K.'d. When I see their three names on there, then I put my initials on here, that it could be stamped with my name. That 'Allowed' stamp is put on there after the Board meets, and has approved all of the claims for that day. That 'Allowed' and that initial— or that date are all in one stamp, Chairman of the Board of Supervisors. This 'William H. Cotton' is a separate stamp that is put on there by the girl after I put my initials on there in red pencil."

He testified that he did not know what was in the claim Exhibit 2 when he put his initials on it, nor that Croft had filed a claim for seven new motors and seven new transmissions. He also testified that Croft nor anyone had ever talked to him about such a claim, nor had he ordered such equipment.

The fact that Cotton's name was rubber stamped on the blank line in the auditor's "Allowed" stamp above the words "Chairman of Board of Supervisors" did not indicate any action or attitude of mind on the part of Cotton personally, but was simply an indication of the action of the Board, and the same is true of his red-pencil initials.

The testimony of the auditor confirms that of Cotton respecting the usual process in the allowance of claims by the Board. He also testified:

"Q. And it is true, isn't it Mr. Linstrum, that after claims are allowed as you have testified, the 'Allowed' stamp and the signature of the chairman of the Board, whoever he may be, is

placed on there as indicating the action of the Board, isn't that true? A. Yes, sir. * * * Q. In other words, the fact of Mr. Cotton's signature appearing on these claims under the word 'Allowed' happened solely because he happened to be Chairman of the Board of Supervisors, isn't that right? A. Yes, sir. Q. And his signature would be on a claim as Chairman of the Board of Supervisors even if he personally had voted against it? A. Yes, sir."

There is nothing in the conduct of Cotton in the Board proceedings respecting Exhibit 2 nor in any marks or notations thereon by him which in any way corroborates the testimony of Croft or which tends to show that he aided and abetted the latter. This fact was made known to the jury in instruction 16, in which the court directed the jury that the initials of the defendant and his signature and the words "allowed March 26, 1946" on Exhibit 2 under the evidence were placed thereon after the issuance and payment of the warrant, Exhibit 3, and were not to be considered by the jury that the defendant aided and abetted in the commission of the crime charged.

I. We cannot agree with the contention of the State and the holding of the trial court that there was no error in the admission in evidence of the numerous other claims, invoices and requisitions respecting which there was no proper foundation for their introduction, and no evidence whatsoever of falsity.

The State in support of its theory and contention that the offense with which the accused were charged was but one of a planned series of similar offenses committed by them within a reasonably limited time either before or after the commission of the offense charged, in order to show such plan, and that the offense was intentionally, knowingly and designedly committed by the accused, offered evidence of the commission of other alleged similar offenses by the accused in which the defendant aided and abetted. The admission of such testimony for such and other purposes is uniformly allowed, where it is relevant to the issues, and there is such connection and similarity between the offense charged and the other offenses that the latter can reasonably be said to tend to establish the first, or some essential fact in issue. It is an exception to the general rule that the State

cannot prove against the defendant any crime not alleged in the charge against him. Under this exception it is competent to receive evidence of these other offenses to establish motive, intent, planned crime etc. It is a sound rule of evidence which this court has announced and followed many times. A few of these authorities are: State v. Konzen, 186 Iowa 1057–1065, 171 N. W. 137; State v. La Vere, 194 Iowa 1373, 1381, 191 N. W. 93; State v. Vance, 119 Iowa 685, 687, 94 N. W. 204; State v. Brady, 100 Iowa 191, 195–197, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560; State v. O'Connell, 144 Iowa 559, 561, 562, 123 N. W. 201; State v. Baugh, 200 Iowa 1225–1228, 206 N. W. 250; State v. Feldman, 201 Iowa 1089, 1092, 202 N. W. 90; State v. Jamison, 74 Iowa 613, 617, 618, 38 N. W. 509; State v. Dunne, 234 Iowa 1185, 1195, 1196, 15 N. W. 2d 296; State v. Carter, 112 Iowa 15, 19, 20, 83 N. W. 715; State v. McCutchan, 219 Iowa 1029, 1046–1048, 259 N. W. 23; State v. Cordaro, 206 Iowa 347, 349, 350, 353, 218 N. W. 477; State v. Rand, 238 Iowa 250, 25 N. W. 2d 800, 809, 170 A. L. R. 289; State v. Yarham, 206 Iowa 833, 838–840, 221 N. W. 493; State v. Prins, 113 Iowa 72, 74, 75, 84 N. W. 980; State v. Porter, 229 Iowa 882, 885–887, 294 N. W. 898; State v. Foxton, 166 Iowa 181, 202–204, 147 N. W. 347, 52 L. R. A., N. S., 919, Ann. Cas. 1916E 727; State v. Renslow, 209 Iowa 982, 983, 229 N. W. 225; State v. Huckins, 212 Iowa 283, 290–292, 234 N. W. 554; 22 C. J. S., Criminal Law, 1089 et seq., sections 683–691j; 20 Am. Jur., Evidence, 289 et seq., sections 310–318.

As stated in this rule of evidence the "other" acts or transactions of which testimony can be offered must be reasonably similar to the act on which the charge against the accused is based. They must be wrongful acts, crimes, offenses or attempted offenses of a like nature to the charge against the defendant. This fact is implicit in the statement of the principle. Right conduct, lawful acts and honest transactions ordinarily are not indicative of a plan or scheme to commit the offense charged, nor of any guilty knowledge of it, or wrongful or criminal intent with respect to its commission on the part of the accused. It is a sound and well-settled principle, expressly stated or clearly implied in the decisions of this court above

noted. See State v. Konzen, 186 Iowa 1057, 1063, 1064, 171 N. W. 137, 138, in which defendant was charged with the crime of cheating the Minneapolis & St. Louis Railroad Company on the false claim that through its negligence he had fallen from the platform of one of its coaches to his injury. Evidence was introduced of similar claims which he had successfully made against other railroad companies. Defendant contended that there was no evidence of the falsity of these other claims. The jury found otherwise, and convicted defendant. In affirming, this court said:

"It is conceded—for it could not well be denied—that, for the purpose of showing motive and scheme and purpose to defraud in any particular action called in question, it may be shown that similar claims prior to this were made by the party charged. But it is contended that, in the instant case, there is no proof that the defendant did not suffer the injuries in these other cases for which he claimed satisfaction, and that there is no evidence that he practiced any fraud in securing the settlement, or made any misrepresentations to induce the same. This evidence was only submitted to the jury on the question of the intent to defraud in the particular case. The intent is not always capable of direct and positive proof. * * * The falsity of the claim made in this case must be proven, independent of these other transactions. But, the falsity of the claim made being proven, the intent of the party may be shown by his conduct, and to this end, evidence of the character herein complained of is admitted. * * * *Of course, it follows without argument that proof of similar transactions which were in good faith, not bottomed on fraud or deceit, does not prove the scienter involved in a suit where fraud and deceit were charged.* The jury could well find from the record made here that the statements made by the defendant to secure the settlement in controversy were not well founded. That might be true, and still every other claim may have been founded upon actual injury, and made in good faith. It would not, if that were so, tend to prove a fraudulent intent in the instant case. The court in its instructions limited this evidence to prove the intent only." (Italics supplied.)

In State v. Huckins, supra, 212 Iowa 283, 291, 234 N. W. 554, 559, the court, in speaking of other frauds, said: "It must, of course, be shown that the representations were false." In State v. Yarham, supra, 206 Iowa 833, 840, 221 N. W. 493, 496, defendant was indicted and tried for obtaining by false pretenses a promissory note from Mrs. Roth in securing her order for a rug. Similar transactions were shown with others. In reversing, the court said:

"It may further be noted that the testimony of Mrs. Birke does not come within the rule governing similar transactions for the purpose of showing the intent of the defendant. There was no attempt on the part of the State in the Birke transaction, for instance, to prove that there was any intent to defraud in his dealings with Mrs. Birke. *Proof of similar transactions involving crime must be clearly shown. Mere suspicion is not enough. The evidence must be such that there can be no room for speculation in the minds of the jury whether the similar crimes attempted to be shown were actually committed or not.*" (Italics supplied.)

In State v. Foxton, supra, 166 Iowa 181, 203, 204, 147 N. W. 347, 355, defendant was indicted and convicted of cheating by false pretenses in obtaining money on a check drawn upon a bank in which he had no funds and no reason to believe it would be paid. The court received evidence of other checks given by defendant to show his intention and scheme to defraud. The only question on this point is the evidence of a check given by him to Anacker, a grocer, on a Minneapolis bank. The groceries were $3, and the balance of the check was given him in cash. The check was returned to Anacker by the bank in which it was deposited. In reversing, this court said:

"This was all the evidence there was as to the Anacker check. There was no evidence that the check was ever presented to the bank on which it was drawn; no evidence that defendant did not have credit at the bank; no evidence that the check, if presented to the bank in proper time, would not have been paid by the bank.

"The admission of this testimony was prejudicial to the defendant * * *, the State offered this Anacker transaction, the purpose of which was to show that he had drawn checks on other banks in which he had no funds, and no reasonable expectation that the check would be paid by the bank on which it was drawn. If the State desired this inference to be drawn from the fact, it should have proceeded further and shown that defendant had no money in the North Western National Bank of Minneapolis, or no reasonable expectation that a check on that bank would be paid on presentation. * * *

"In the absence of any [such] showing * * * proof that he issued a check upon this bank, while it might lead the jury to believe, to the defendant's prejudice, that he intended to defraud * * * would not justify such a conclusion, unless it was affirmatively shown that the conditions did not exist which justified him in issuing a check upon that bank. *The proof, to be admissible, must tend to show the commission of an offense, like in character, to the one charged, and this proof is essential as a basis on which to predicate a conclusion that the intent to defraud existed in the mind of the defendant at the time of the issuing of the check in question.*" (Italics supplied.)

In the appeal in this case the State does not question the rule as stated in the cases above noted. The trial court made it the law of the case by its instructions. Over defendant's objections on numerous grounds, including insufficient evidence of falsity, the State introduced in evidence thirty-two claims filed by Croft against the Polk County Welfare Department for merchandise furnished and services rendered it. These claims are Exhibit 32 and Exhibit 2, on which the indictment is based, and Exhibits 35 to 63, both inclusive. The State also introduced, over objection, Exhibit 100 for $7459.26. It was not against the Welfare Department, but was for radio equipment for the county sheriff. The first of these claims is Exhibit 47, No. 26 under the auditor's filing system, and filed in his office January 3, 1945. The last claim filed in 1945 was Exhibit 58, No. 8781 in the auditor's office, filed December 28, 1945. The auditor numbered claims filed consecutively, beginning with No. 1 in January of each year. The number 8781 on Exhibit 58 indicates

the approximate number of claims passed upon by the Board of Supervisors in 1945. Exhibit 59, auditor's No. 4, was filed January 4, 1946, and Exhibit 38, auditor's No. 3832, filed June 1, 1946, was the last claim offered in evidence by the State as a claim "similar" to Exhibit 2, as allegedly indicating guilty knowledge and wrongful intent on the part of Cotton.

These exhibits, as a whole, contained one hundred thirty-five requisitions and approximately six hundred separate items for merchandise and labor. Many of these exhibits contained numerous separate sheets. Exhibit 47 had approximately ninety sheets. If our computations are correct, the total amount of the claims in the exhibits filed in 1945 is $15,859.95 and the total amount filed in 1946 is $14,812.12, or a total for the seventeen months of $30,672.07. We are assuming that the diligence of the prosecution and of Mr. Powers and Mr. Walters of the Civic Action Committee has not overlooked any claims filed by Croft.

These exhibits were continuously throughout the trial exhibited to the jury in the examination by the prosecution of numerous witnesses—public officers, handwriting· experts, mechanics and others—as fraudulent claims. The effect of this was to impress upon the minds of the jurors the financial gravity of the defendant's offense. The prosecution must have known throughout the trial that in those exhibits there were many, many requisitions and hundreds of invoice items of merchandise and services that represented honest and good-faith transactions involving thousands of dollars. According to the State's witness the total mileage on the seven cars in July 1946 was 334,644 miles. Necessarily there was much expense in operating and servicing these cars. The prosecution does not concede this legitimate expense in its presentation to this court, but it states that all of the exhibits "were fraudulent because each and all of them contained items which were fictitious." But, in the trial below, they were exhibited to the jury as being all fraudulent. Croft testified as to only Exhibits 57, 59, 60, 61 and 2. He was never asked by the prosecution as to the truth or falsity of any of the other of these "similar" claims. On each of these thirty-two claims is his affidavit that each "account is just and true" and unpaid. He testified that the invoice statements in

the Exhibits 57, 59, 60, 61 and 2 were written by him. The invoices in all of the exhibits appear to be in his handwriting. The prosecution must have known that he knew whether every invoice was true or false, and what a willing and compliant witness he was for the State, and yet it apparently feared to examine him as to the twenty-seven other exhibits lest his answers would be unfavorable to its contention. It has no answer for this failure, except to say to the defense "Why didn't you cross-examine him?" If it had the court would have promptly sustained the State's objection, which probably would have been made, that it was not proper cross-examination. Good trial lawyers in such a situation do not try to make their case by cross-examining the opposition's seasoned liar. They know that he will falsify as readily on cross-examination as on direct. But the burden was on the State to prove not only the guilt of the defendant, but also to prove every element essential to the admissibility of these other claims. One of these elements was their falsity.

Many years ago in Blatch v. Archer, 1 Cowper 63, 65, Lord Mansfield announced this maxim: "All evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted." It has been reannounced by courts to this day. Each part of the principle is applicable to the matter before us. Croft, the State's witness, had complete and conclusive knowledge of the facts respecting these twenty-seven claims and full power to produce the evidence, while the defendant was powerless to contradict it. It is a well and long-recognized principle, thus stated in Hall v. Vanderpool, 156 Pa. 152, 155, 26 A. 1069, 1071, that: "Where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to do so, the jury may draw an inference that it would be unfavorable to him." This court has stated the same principle at different times. See Lauer v. Banning, 152 Iowa 99, 103, 131 N. W. 783; Henderson v. Ball, 193 Iowa 812, 820, 186 N. W. 668; Grimes Sav. Bk. v. McHarg, 224 Iowa 644, 648, 276 N. W. 781. As the facile stubby pencil of Justice Weaver wrote in Shideler v. Naughton, 163 Iowa

616, 619, 145 N. W. 280, 281, it is "a reticence * * * of material significance." In the words of an old volume of Starkie on Evidence (1876), Tenth Ed., 846: "* * * it would be contrary to every principle of reason, and to all experience of human conduct, to form any other conclusion." Croft was a twice-convicted crook, a self-confessed perjurer, and his testimony in this case is far from convincing. It behooves a litigant having such a witness to produce all available evidence which the exigencies of the case demand. As said by the wise and experienced Justice Evans in Nehring v. Hamilton, 210 Iowa 1292, 1295, 232 N. W. 655, 656: "In weighing this evidence, the judicial mind naturally seeks for just such corroboration." Where the absent testimony is that of the actor in the transactions, strong evidence is necessary to relieve the party from the prejudicial effect of the presumption. It is said in Union Trust Co. v. McClellan, 40 W. Va. 405, 21 S. E. 1025, the presumption is conclusive.

The admission of these exhibits where no attempt was made to prove their falsity is reversible error. But the extreme prejudice thereof was particularly intensified in the use the prosecution made of them. It cannot be fairly said that these exhibits were simply made the vehicle to carry to the jury other specific items in the claims which the State sought to prove were false, by testimony of others than Croft. In the cross-examination of Cotton, the prosecution took most, if not all, of these exhibits and handed them to him and had him turn to each requisition that had his "OK" on it to covertly and wrongfully impress upon the jury the conviction that he had approved a false invoice. Exhibit 42 was the first exhibit on which he was thus interrogated in substance:

"Turn to requisition 890. State to the court and jury whether or not you find your initials on it? A. Yes, sir. Q. Tell the court and jury whether or not you had knowledge of the contents of the requisition 890 when you signed your initials on it? A. I read the requisition."

Requisition 890 is dated July 19, 1945. Here are its contents:

"12 600x16 inner tubes, synthetic @ $3.89 each—  $46.68
Change oil in 7 cars, 5 qts. per car @ $1.75 each—  $12.25

    For all cars  $58.93 "

What is there on the face of that requisition to apprise Cotton or anyone else that it was false? There is no evidence direct or circumstantial that it was.

The examination continued:

"Look at requisition 887. Tell the court and jury if you find your name on the face of that requisition? A. Yes, sir. Q. *Will you hold the requisition up so that the jury can see it?* [Italics supplied]

"Mr. Langdon: Same objection.

"The Court: Overruled.

"Q. Tell the court and jury whether or not you knew what the contents of requisition 887 was when you signed your name to it? (Objection was overruled.) A. I undoubtedly read it. Q. Tell the court and jury whether or not you signed your name to the requisition 887 for the purpose of expressing your knowledge of the contents of the requisition? A. I read the requisition when I signed it."

The same examination was gone through with as to requisitions 886 and 888 in the same exhibit—Exhibit 42. Requisition No. 887 applied to car license No. 37384, to wit:

"1 set of Seat Covers, front and rear—  $17.40
   Labor to install  —  4.00
   1 Radiator, complete  —  26.00
   Labor on cooling system  —  7.50

     $54.90"

Requisition No. 886:

"1 set of Seat Covers, front and rear  —  $17.40
   Labor to install  —  4.00

   (Received for Car No. 37833)  $21.40"

Requisition No. 888:

"1 Radiator assembly,

| | | | |
|---|---|---|---|
| complete | $26.00 | 1 Cylinder head | $22.00 |
| 1 Water pump assembly | 5.50 | 1 set gaskets | 1.30 |
| Labor on cooling system & Thermostat @ $1.25 | 10.00 | 6 exhaust valves | 3.60 |
| | | 6 intake valves | 3.60 |
| 1 Distributor Exchange | 10.00 | 12 valve springs | 1.80 |
| Labor on motor | 3.50 | Labor on motor | 16.50 |

(Received for car No. 37385)                    $103.80"

No witness testified about these requisitions. There is no evidence, direct or circumstantial, that the charges were false or fictitious.

The defendant was interrogated in the same manner as to Exhibit 43.

This examination, substantially identical, was had with defendant as to Exhibits 44, 45, 46, 47, 48, 49, 51, 52, 53, 40, 39, 54, 60. Persistent and full objections were made to the examinations by defendant.

We cannot, of course, set out the itemized charges in these invoices and requisitions, but we will briefly refer to those in Exhibit 43—and we are not hand-picking these exhibits. The fact that the prosecution failed to ask Croft, as a witness, about these exhibits, is indicative that they did not appear false on their face. Requisition 822, dated June 4, 1945, had a charge for twenty-eight tires and twenty-eight tubes. This is a large order for one time, but there were seven cars. All were having heavy service. The equipment was not so easy to get, and having some stock in reserve was not criminal. Requisition 821 was for "1 Rear deck, lock, keys and handle assembly," and a straightening of the rear deck for car No. 8051. Requisition 819 was for a somewhat like service on car No. 8047, and painting the panels. Requisition 818 had items for: "tightening chassis, brakes, etc. ($10.50) ; 1 set of spark plugs ($4.10) ; 1 set parts & 1 condenser ($1.20) ; tuning motor, etc. ($6.50)." Requisition 815: "Storage and service on all cars for June 1945 ($100)."

Requisition 820 appears to be a general repair job on car No. 8048, containing nineteen items averaging approximately $6.00 each.

The charges in the above-noted requisitions are fair samplings of those in the other exhibits listed just above. Perhaps Croft was "padding" his accounts. He had had exclusive charge of the Welfare cars since 1934, with little supervision. The cars were used for day and night service. It was Croft's job to keep them fit for service. What should be done was necessarily largely left to his judgment and discretion throughout the years. The defendant and other supervisors may have been derelict in the performance of their duties in this matter. But defendant was on trial for a specific crime, and without their falsity being shown invoices and requisitions, having no legitimate tendency to sustain the indictment, should not have been given to the jury.

Croft was examined as to Exhibits 57, 59, 60 and 61. These were the only allegedly "similar" claims that he testified contained false items. Exhibit 57 was filed December 20, 1945. No requisition in it and no invoice had the "O.K." of the defendant on it. He was not one of the auditing committee who recommended payment of the claim. Those on the committee who audited the bill and approved it were Dewey, Hitz and Hild. The bill was for $794.22. It purported to be for repairs on two Welfare Department cars—car No. 4 and car No. 2. The invoices are in Croft's writing. There was no requisition attached to the claim for the work on car No. 4, although the rubber stamp of Mr. Huss, or whoever audited the bill in the Welfare Department, shows the requisition was No. 1124. Croft testified that the work was not done on car No. 4, but on a car registered in the name of the State Building & Loan Association (Cotton's company) which Cotton had him repair for his daughter. Croft is not corroborated in this by either direct or circumstantial evidence. The bill was for $389.36. Cotton testified that Croft had repaired such a car for him, but not so extensively, and that he had paid Croft for it.

The repair bill on car No. 2 in the claim was $400.13. The requisition therefor is No. 1125, dated December 20, 1945. The

invoice is dated "12/10/45". On cross-examination, Croft was asked concerning this claim: "That work that is on the invoice of 12/10/45 was actually performed on one of the Welfare cars? A. On this one here, yes sir. Q. That is on this statement of yours dated 12/10/45? That was actually done? A. Yes sir." Notwithstanding this uncontradicted testimony of Croft that the merchandise and services were delivered and performed, the invoice and requisition No. 1125 for $400.13 went to the jury as false.

Croft testified that he did not deliver any of the tires described in Exhibits 59, 60 and 61. He gave no such testimony as to the other items in these exhibits. Exhibit 60 was filed February 26, 1946. The amount of this claim was $893.20. It contained invoices and requisitions No. 1217 and No. 1219. Neither had the "O.K." of Cotton. Dewey, Elson and Cotton were on the auditing committee which approved the bill. Requisition No. 1217 was for $103.20. The invoice for it was No. 2273.. Croft, on cross-examination, testified that it was in his handwriting and that he delivered all of the merchandise described therein. This invoice and requisition should not have gone to the jury.

Requisition No. 1219 for $786.22 covered invoice No. 2268 for $12.50, invoice 2270 for twenty-four 600 x 16 inner tubes for $84, invoice 2274 for services of $96.25, invoice 2275 for labor and replacements for $110.60. Croft testified that the merchandise and services covered by these four invoices were furnished. There is no evidence to the contrary, and being bona fide transactions they furnished no evidence or inference as to the guilty knowledge or wrongful intent of Croft or Cotton.

Invoice 2271 of requisition 1219 is as follows:

"12  650 x 16 Firestone tires @ $20.13 and Federal Tax $241.56
     Cars No. 6 (4 tires), No. 1 (4 tires), No. 3 (4 tires)
 12  650 x 16 (Firestone tires) *for reserve stock*        241.56
                                                          _____
     [Italics supplied]                                   $483.12"

Croft testified that these tires were not delivered to the Welfare Department. As a matter of fact he never delivered any

automobile equipment to the department. It was all kept in his stock room. There is no corroboration for Croft's testimony of nondelivery. Of this claim of $893.20 there is Croft's uncorroborated testimony that $483.12 thereof was without consideration. Of the balance of $410.08 there was no evidence of falsity.

In an attempt to get some corroboration through defendant by admissions or statements from him, Croft testified—after his attention was specifically called by the prosecution to invoices 2270 and 2271 in Exhibit 60—that he took these two invoices, after preparing them at his garage, to Thompson in the Welfare office, and he heard Thompson telephone Cotton and "tell him that we had this bill here for some tires and wanted to know if it was all right, and he hung up the phone and said 'I guess it is', and he therefore signed this requisition and paper here" (the rubber stamp on the back submitting the claim to the Board of Supervisors for approval). It is open to query, at least, why Croft, who said Thompson only called Cotton on claims of $1000 or more, should telephone him about the tires costing $483.12 and said nothing to Cotton about the other items of $410.08, or the other requisition No. 1217. Both of them were signed on the same day, February 26, 1946. Four of these tires were going to car No. 1—Cotton's official car—and twelve tires were going into "reserve stock." Under the circumstances the urgency to get Cotton's approval seems questionable. Thompson denied that Croft presented the bill to him and the telephoning.

Exhibit 59 was a claim for $1244.90 filed January 4, 1946, and allowed January 10, 1946. Neither the requisition No. 1136 nor the invoice for $1220.50 ($24.40 tax) for fifty 650x16 tires and the same number of inner tubes was approved by Cotton. Neither did he recommend payment of the claim. Elson, Parmenter and Hild audited the bill and recommended its payment. Croft testified that he took the invoice of this bill to Thompson and when the latter telephoned Cotton that Croft had an invoice for fifty tires and fifty tubes, giving their cost, he heard Cotton say: "That is O.K., put it through the regular way." Thompson denied Croft's testimony about presenting the invoice and the telephoning.

Croft testified that he took the invoice in Exhibit 61 for

632

$1192, dated April 12, 1946, requisition No. 1285 for fifty tires and fifty tubes to Thompson and heard him telephone Cotton about the bill, and that he then turned around and said: "Well, I guess it is all right", and signed the requisition. Thompson denied the telephoning incident and the presentation of the invoice by Croft.

On page 105 of the State's argument, it states: "One of the evidently favorite claims was the claim for setting king pin inclination, caster, camber and toe-in." The only witness who testified about the charges for this mechanical operation was Carl Nimrod, a State examiner from the State Auditor's office, who began an examination of various Polk county offices, on July 5, 1946, and completed it on December 2, 1946. It included the Social Welfare Department. Item 23 and a few lines from item 25 of his report were admitted in evidence. Item 23 embodied his conclusion that there were some duplications in Croft's charges for the mechanical adjustment above noted. The charge for it was $7.50, and it was his conclusion, based largely on the dates of the charges and the cars affected that there were seven of these duplications amounting to $52.50. He testified that he knew nothing about the nature of the service, and that he never examined any of the cars. Croft did not testify on the matter. Mr. Strand and Mr. Murray of the Iowa Bureau of Criminal Investigation, aided by Mr. Vavra, an automobile mechanic, on December 20, 1946, examined the seven Welfare Department cars principally as to the motors, brakes and heaters. David Karp, an automobile expert, also examined the cars. None of them gave any testimony as to the king pin etc. assembly. Mr. Mitchell, an automobile mechanic, with Robert Barton examined these cars in late July 1946. What Mr. Barton's qualifications for the job were do not appear, except that he had been employed by Mr. Paul Walters, apparently in civic investigations, for sixty days before his examination, and continued in the employment until September. He was one of the constables who worked with Mr. Grossnickle and had been appointed deputy sheriff of Polk county by Mr. Reppert in January 1947. Neither of these witnesses testified about the king pin. Most every motorist has had some experience with the wheels of his car

getting out of alignment. The king pin and its adjuncts are on the front axle—one on each side. By adjusting them the front wheels are kept in proper inclination and alignment. One or both wheels may need adjustment. Neither Croft nor any of the mechanics offered any evidence of falsity in these items.

In the State's argument (page 105) is this statement: "This particular service was alleged to have been performed on seven Welfare cars on seven different occasions as evidenced by Exhibits Nos. 44, 45, 46, 47, 48, 49, 52." Cotton's O.K. is on the requisitions. We have carefully examined each invoice and each requisition in each of said exhibits, and find: Exhibit 46 for $357.48 filed May 18, 1945 has four requisitions with twenty-seven items. Invoice 1155 therein dated May 5, 1945 has a charge of $7.50 for this service, on requisition No. 788 dated May 15, 1945. This charge is marked "refunded" on the invoice. The charge was against car No. 8046.

Exhibit 45 for $519.22 filed April 24, 1945 has seven requisitions with fifty-two items. Invoice 1070 dated April 18, 1945 on requisition No. 751 dated April 20, 1945 has a charge of $7.50 for this service on car No. 8046 which is marked "refunded" on the invoice. Invoice 1068 dated April 20, 1945 on requisition No. 752-A dated April 20; 1945 has a charge of $7.50 for this service on car No. 8047.

Exhibit 49 for $283.98 filed March 12, 1945 has four requisitions and nineteen items. Invoice No. 877 dated February 28, 1945 on requisition No. 674 dated March 2, 1945 has a charge of $7.50 for this service on car No. 8051.

Exhibit 52 for $315.96 filed February 27, 1945 has eight requisitions and twenty-seven items. Invoice No. 811 dated February 2, 1945 on requisition No. 651 dated February 19, 1945 has a charge of $7.50 for this service on car No. 3834.

Exhibit 44 for $327.79 filed April 13, 1945 has eleven requisitions and thirty-five items. Invoice 1014 dated March 31, 1945 on requisition 731 has a charge of $7.50 on car No. 8051 marked "refunded." Invoice 1011, dated March 31, 1945 on requisition 730 has a charge of $7.50 on car No. 8050 marked "refunded." Invoice 1010 dated March 31, 1945 on requisition 729 has a charge of $7.50 on car No. 8049 marked "refunded."

Invoice 1013 dated March 31, 1945 on requisition 728 has a charge of $7.50 on car No. 8047 marked "refunded." Invoice 1012 dated March 31, 1945 on requisition 727 has a charge of $7.50 on car No. 8046. Invoice 990 dated March 29, 1945 on requisition 723 has a charge of $7.50 on car No. 8048. Invoice 989 dated March 29, 1945 on requisition 724 has a charge of $7.50 on car No. 8050.

Exhibit 48 for $629.24 filed February 6, 1945 has five requisitions and twenty-nine items. Invoice 740 dated January 31, 1945 on requisition 636 dated February 2, 1945 has a charge of $7.50 against car No. 3855 which is marked "refunded." Requisition No. 627 states that this car No. 4143, the truck, was wrecked on January 24 and the total charge for repairing the damage was $249.05. In this claim are forty-one slips of paper showing the sale of 576½ gallons of gasoline at eighteen cents a gallon for a total of $103.77. Each slip purports to be signed by the person receiving the gasoline.

Exhibit 47 for $424.80 filed January 3, 1945 has fifteen requisitions and fifty items. Invoice 707 dated January 24, 1945 on requisition 617 has a charge of $10.50 for labor on steering assembly and setting king pin inclination on car No. 3832. Invoice 725 dated January 27, 1945 on requisition 626 dated January 30, 1945 has a charge of $7.50 on car No. 3832. Invoice 504 dated December 18, 1944 on requisition 581 dated January 5, 1945 has a charge of $7.50 for king pin adjustment also on car No. 3832. This exhibit (47) has a charge of $75.28 for gasoline with slips for each sale signed by the purchaser.

There is no basis for the contention of the prosecution that the charges for the king pin adjustments in Exhibits 44, 45, 46, 47, 48, 49 and 52 were false. And there is no evidence of a duplicated charge except a charge of $7.50 in Exhibit 47, and there is no probable ground for contending that this duplication was intentional. Yet because of the contention of the State that these seven exhibits contained duplicated charges totalling $52.50, the exhibits aggregating $2358.47 were submitted to the jury as "similar offenses" or false claims. This was prejudicial error. There is nothing shown upon the requisitions in each and all of these seven exhibits which would reasonably indicate to the

defendant that the merchandise and services shown were not furnished, or that his approval should not be noted thereon.

We have not fully checked the voluminous exhibits as to other contentions by the State of false or duplicate charges by Croft with respect to car heaters, defrosters, brakes, tires and tubes, and we will not comment further thereon. What we have said is amply sufficient to show that the court erred repeatedly in the admission of evidence of so-called "similar offenses" without proper foundation therefor and proof of the elements essential to receiving the evidence.

Croft testified that the three motors and transmissions described in requisition No. 693, for which a total charge of $544.20 was made, were delivered to the Welfare Department as stated in Exhibit 32 filed in the auditor's office March 28, 1945. This exhibit was then ordered withdrawn by the court. Upon testimony by Mr. Nimrod that Exhibit 100, being a claim for $7459.26 filed January 24, 1946, for the purchase of radio equipment for the sheriff, was a valid claim, objection to its admission was then sustained.

We again call attention to the quotation from State v. Yarham, supra, 206 Iowa 833, 840, 221 N. W. 493, 496, to the effect that these similar offenses must be clearly shown. Mere suspicion is not enough. "The evidence must be such that there can be no room for speculation in the minds of the jury whether the similar crimes attempted to be shown were actually committed or not."

In State v. Foxton, supra, 166 Iowa 181, 147 N. W. 347, the State failed to show that a check of a few dollars was worthless, and this court reversed for the failure.

The prejudice to the defendant in the case before us is especially aggravated both because of the large amounts involved and the numerous instances in which falsity of the "similar" claims was not shown. There is no merit in any contention that it was for the jury to pass upon the validity or falsity of these claims. Before any such issue could be rightly submitted to the jury, it was essential that there be evidence tending to show their falsity. There was no such evidence. The prosecution does not contend that they were false.

636

■ II. In the first part of July 1946, Mr. Paul W. Walters and Mr. B. J. Powers, lawyers in Des Moines and members of the Civic Action Committee, called upon the Board of Supervisors—all were present—and lectured its members at length upon the dishonesty of Croft in his dealings with the Board and criticized the Board for using his services. They told the Board that they had examined the claims against the Welfare Department and had a record and photostats of them and that many of them were fraudulent. They spoke of the seven motors and transmissions described in Exhibit 2 as purchased on March 15, 1946, and of grinding valves in new engines thirty days after the engines were purchased. Powers testified:

"We asked them, I asked the question, I said, 'any of you believe that' and I said, 'I don't believe it,' that they ground the valves 30 days after they put new motors in. The Board was there and I just pointed around to each one of them and said, 'Do you believe that story?' and there was no answer. Q. Now, when you said, 'Do you believe that story?' did you or did you not address that question directly to the defendant, William H. Cotton? A. To all of them. Mr. Cotton was sitting right beside me, and then on the tires I said 'I don't believe any such number of tires was ever put on those cars, and do any of you believe that?' and there was no answer."

The inferences of the witness are rather inconsistent. He infers that no new engines were purchased and then he infers that a charge for grinding valves in the old motors within thirty days after the alleged purchase of the new motors must be false. His thirty-day estimate is out of line somewhat. The earliest charge for grinding valves after the alleged purchase of the new motors on March 15, 1946 was an invoice dated May 11, 1946, shown in Exhibit 38. The witness testified he asked Cotton how all of these purchases and requisitions were getting by him, and he did not answer. Then they discussed Bendix washers ordered for the County Home and the refunding of the money when the washers could not be obtained. He told the Board that the laundry facilities were already sufficient at the Home. He criticized the Board for paying more for gasoline per gallon

than he paid. He criticized the purchase of some cold rolled steel shafts. There is no evidence as to Cotton's connection with these matters. He discussed the county's credit and the radio purchases for the sheriff, which the State conceded were legitimate. He discussed the mileage of the sheriff's cars and a truck that Tip Overturff had sold to Polk county. Walters' testimony was similar to that of Powers. One of the Board members asked what the witnesses thought should be done in the matter, and the answer was to "quit doing business with Croft at once." The prosecution contends that Cotton's silence was an admission of his guilt. This question was asked Walters:

"Now what, if any, explanation did Chairman William H. Cotton have to offer or did he offer at that time? A. Well, the only explanation that was made, and he may have made it or not, was that merchandise was hard to get and that Croft seemed able to get it. We said, 'Why are you doing all of this business with Mr. Croft, there are other merchants in town that are reliable?' and the answer was made that he could get things that other people couldn't."

The testimony of these witnesses shows that Cotton and the other members of the Board listened respectfully to the witnesses and offered their co-operation. While the witnesses voiced their dissatisfaction with the manner in which the county's business was being handled, and particularly with Croft, there was no charge of criminality made against the Board or Cotton and no accusation against the latter that he had aided and abetted Croft in defrauding the county. Justice Oliver speaking for the court has well and clearly stated the applicable rule of law in Friedman v. City of Forest City, 239 Iowa 112, 133, 134, 30 N. W. 2d 752, 763, and in Doherty v. Edwards, 227 Iowa 1264, 1272, 290 N. W. 672. See also State v. Sorenson, 157 Iowa 534, 543, 544, 138 N. W. 411. The testimony of the State did not bring the silence of the defendant within the rule.

But little of the testimony of these witnesses was proper or competent for any purpose. The queries of the witnesses as to some specific matters may have had a legitimate purpose, but many of the matters recited to the jury were not competent or

638

material to the issues of the case, and were certainly prejudicial. The defendant's objections to the testimony and motions to strike should have been sustained.

III.   B. B. Dewey, who had been a member of the Board of Supervisors for seventeen years and its secretary for eighteen years preceding his term, was a witness for the State. He was one of the Auditing Committee that had recommended payment of Exhibit 2. He testified that a day or two after March 25, 1946, he became suspicious of Croft, and thereafter investigated the claims filed by him in the auditor's office and paid to him for servicing the Welfare Department cars from January 1, 1946 to April 1, 1946. He said his computation showed this expenditure to be around twelve or fourteen thousand dollars. While the court struck out his testimony as to what he discovered in his investigations it is a matter to be considered in connection with his alleged conversation with the defendant. These Croft claims were received in evidence and have been certified to this court. These claims were: Exhibit 59 filed January 4, 1946 for $1244.90, Exhibit 35 filed January 30, 1946 for $723.33, Exhibit 60 filed February 26, 1946 for $893.20, Exhibit 2 filed March 15, 1946 for $1285.20, and Exhibit 36 filed March 28, 1946 and allowed April 1, 1946 for $825.62. The total of these is $4972.25. Dewey recommended four of these claims for payment and Cotton recommended two of them. The total of all claims filed by Croft between January 1, 1946 and June 1, 1946 with respect to the Welfare Department cars was $7352.86.

Dewey testified that Cotton argued and disagreed with him when he told him the Croft claims between January 1, and April 1, 1946 were between $12,000 to $14,000. It is not surprising that Cotton expressed his disagreement.

■   IV.   We think the court erred in giving instruction No. 22. The first sentence is:

"Testimony has been given by the witnesses Walters, Powers and Dewey for the State *tending* to show that certain statements were made by the defendant on the occasions testified to by said witnesses; these statements, if made, *being admissions* of certain facts *tending* to establish the defendant's guilt of the offense charged." (Italics supplied.)

We have referred to the testimony of the three witnesses. The court told the jury that testimony was given by those witnesses, etc. This was an invasion of the province of the jury. It was for the jury to determine what their testimony was, whether they in fact said what they testified, and what it tended to show. Further the court instructed that these statements, if made, were admissions. There was no evidence to call for such instruction; no evidence that defendant made any statements constituting admissions tending to establish his guilt of the offense charged. There was no evidence to sustain such an instruction or such a finding by the jury. It was not the duty or province of the court to tell the jury that the statements would be admissions or that they would tend to establish defendant's guilt. The court did so tell them as a matter of law, thus transgressing on the functions and rights of the jury. The instruction is also objectionable because it gives undue attention and prominence to the testimony of these witnesses for the State. It is reversible error. The court has condemned such instructions. See also State v. Lightfoot, 107 Iowa 344, 78 N. W. 41; State v. Dunne, 234 Iowa 1185, 15 N. W. 2d 296, and cases cited; State v. Hubbard, 218 Iowa 239, 250 N. W. 891, and cases cited.

▉ V. In requested instruction No. 6 the defendant asked for the customary instruction that verbal statements should be received with caution. The record properly called for such an instruction. In the second paragraph of instruction No. 22 the court gave an instruction on the subject matter but not as fully as set out in the requested instruction. Furthermore, the court made the instruction apply only to the oral admissions of the defendant. There were witnesses other than the defendant to whom the requested instruction as well as the given instruction were applicable. The latter should have been general in its terms and have applied to the verbal statements of all witnesses. The court erred in refusing to give the requested instruction or one comparable to it.

▉ VI. On August 5, 1946, Croft executed a mortgage on a number of automobiles including five of the cars belonging to the Department of Social Welfare. The mortgage was given to the First National Bank of West Des Moines to secure the

payment of $10,000. The mortgage contained his sworn state-
ment that he was the absolute owner of all of this property. On
direct examination he testified the Welfare Department owned
all of the seven cars used by it. Objections by the State to the
cross-examination with reference to his claimed ownership of
these cars in the mortgage were sustained. The court sustained
objections to the defendant's offer of proof. The court ruled
that the examination was directed to a collateral matter, and
was not cross-examination and was not directed to the credi-
bility of the witness. The ruling was wrong and prejudicial.
The witness had testified directly to the point in direct examina-
tion, and the cross-examination was proper and bore upon the
veracity of the witness and the credibility of his testimony. He
was an important witness for the State, and its only witness
on several matters. While he had been twice convicted of felonies,
and in this trial had admitted that he swore falsely many times
in his own trial, the State had vouched for his credibility in
offering him as a witness. In this trial his testimony as shown
by the record was vulnerable to serious doubt by the jury. He
testified that in the first part of March 1946 the defendant had
arranged with him to get money for the defendant's primary
campaign by obtaining money from the county on false claims.
He testified that on March 16, 1946, Cotton came to his garage
and told him he had noticed Exhibit 2 at the courthouse and
had signed it and that Croft would soon get his money, and
when Croft told him he already had his money, Cotton suggested
his need for funds and Croft gave him $100. Cotton's name
was never on Exhibit 2 until a secretary of the Board stamped
it there on *March 26, 1946*. Liberal cross-examination is the
rule, and particularly so when the liberty of the cross-examiner
is at stake, and the witness has little, if any, regard for the
sanction of an oath. Defendant was entitled to have the jury
know the facts about the mortgage. The court erred in its rulings
in this matter. See State v. Christy, 198 Iowa 1302, 1308, 201
N. W. 42; Eno v. Adair County Mut. Ins. Assn., 229 Iowa 249,
294 N. W. 323.

VII. The court instructed the jury that the witnesses
Croft and Thompson were accomplices and that a conviction

could not be had upon their testimony unless it was corroborated as provided by section 782.5, Code of 1946. Defendant urgently insists that the corroboration, if any there be, does not meet with the requirements of said section. His contention is fairly debatable. Whether there is such corroboration depends much upon the circumstances of the particular case. It has been held that the corrupt character of the accomplice may be considered. State v. Brown, 146 Iowa 113, 117, 118, 124 N. W. 899. Whether there is any corroborating testimony is a question of law, but its sufficiency is a question of fact for the jury. State v. Kurtz, 183 Iowa 480, 482, 165 N. W. 355. As stated in State v. Schlagel, 19 Iowa 169, 171, 172: "The doubt as to the truth of the testimony of accomplices arises from the fact that, upon their own testimony, they stand contaminated with guilt." A rule of evidence approved in that case has often been reannounced by this court, to wit:

"Mr. Roscoe says, 'the rule is that if the jury are satisfied that he (the accomplice) speaks the truth, in some material part of his testimony, in which they see him confirmed by unimpeachable evidence, this may be ground for their believing that he also speaks the truth in other parts as to which there may be no confirmation.' Roscoe's Crim. Ev., 156."

See State v. Hennessy, 55 Iowa 299, 300, 301, 7 N. W. 641; State v. Allen, 57 Iowa 431, 435, 10 N. W. 805; State v. Van Winkle, 80 Iowa 15, 21, 22, 45 N. W. 388; State v. Feuerhaken, 96 Iowa 299, 302, 65 N. W. 299; State v. Dorsey, 154 Iowa 298, 300, 134 N. W. 946; State v. Williams, 218 Iowa 780, 784, 254 N. W. 42; State v. Patten, 191 Iowa 639, 644, 182 N. W. 788.

This court has repeatedly held that the corroboration need not be of every material fact testified to by the accomplice. The requirements of the statute are met if it can fairly be said that the accomplice is corroborated in some material fact legitimately tending to connect the defendant with the commission of the offense. The corroborating evidence may be either circumstantial or direct. Numerous cases could be cited to this point. State v. Pauley, 210 Iowa 192, 194, 195, 230 N. W. 555; State v. Christie, 193 Iowa 482, 486, 487, 187 N. W. 15; State

642

v. Winters, 209 Iowa 565–567, 228 N. W. 286; State v. Thom, 236 Iowa 129, 130, 17 N. W. 2d 96.

Without comment upon specific evidence bearing upon the issue of corroboration or its sufficiency it is our conclusion that the question of whether the requirements of said section 782.5 were met, was, under the record, for the determination of the jury.

VIII. The dissenting opinion herein quotes some language from State v. Brady, 100 Iowa 191, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560, that the admission in evidence of bona fide claims did not prejudice the defendant. The author of the dissent states: "It is difficult for me to see how one can be prejudiced by the introduction of exhibits which the majority opinion states were not false. It would thus appear to me to be carrying the question of claimed prejudice to an extreme."

It is a novel and naïve statement—more specious than sound. The dissent admits that the so-called "similar" claims were in fact bona fide transactions—it confesses and seeks to avoid. Since they were bona fide claims they had no place in the evidence. As such, they in no manner or degree were indicative of any criminal knowledge or intent on the part of either Croft or Cotton. They in no way tended to show that Cotton was an aider or abettor. The State did not offer them in evidence as bona fide claims. They introduced them as false, fraudulent and fictitious claims, and it was the prosecution's purpose, intention and hope that the jury would so consider them. That object was no doubt accomplished. The State throughout the trial was stressing the huge sums of money stolen—$30,000 or $35,000 in the aggregate and $15,000 in the first four or five months in 1946. Such totals could be secured only by including the bona fide claims totaling many thousands of dollars. These claims, concededly genuine, were submitted to the jury under instructions to determine their verity or falsity. This was unquestionably error and extremely prejudicial. There is no merit in a contrary contention. The dissent in one place states that it was not prejudicial to admit bona fide claims, but in another place is this language: "It is my belief that the evidence disclosed by the claims justified the trial court in submitting the question of

the falsity of these claims to the jury for its consideration." In other words, the contention is that it was proper and without prejudice to the defendant to submit to the jury claims of which there was no evidence of falsity, so that the jury might determine that they were false. The decision in State v. Brady, supra, does not rule the question discussed herein. The statement in the dissent that the court in that case approved the acceptance in evidence of all claims filed with the county auditor by Brady is not borne out by the record.

Other errors have been assigned which may not arise on a retrial. Because of the errors above discussed it is our conclusion that the judgment of the district court should be reversed, and it is so ordered.—Reversed.

SMITH, C. J., and OLIVER, HALE, GARFIELD, MULRONEY, and HAYS, JJ., concur.

WENNERSTRUM, J., dissents.

MANTZ, J., takes no part.

WENNERSTRUM, J. (dissenting)—I am unable to agree with the conclusions reached in the majority opinion and therefore dissent. In filing this dissent I feel that I can thus give expression to my conception of the province and duty of this court in dealing with questions presented in the majority opinion.

I. It is the holding of the majority opinion that there was error committed in the admission in evidence of numerous claims, invoices and requisitions in that it is asserted there was no evidence of their falsity. I have no quarrel with the rules of law set out in portions of Division I of the majority opinion. My objection is to their application. There is no question that evidence is admissible as to other claimed crimes where there is a showing in the testimony and evidence concerning these claimed crimes of a similarity between the offense charged and the similar claimed offenses.

In giving consideration to the objection to the reception of the offer of Exhibits 35 to 56 inclusive and Exhibits 58, 62 and 63 it is well to keep in mind what is shown by these various exhibits. An examination of them discloses that these claims filed

by Croft cover the claimed furnishing of a large number of tires, automobile accessories and parts and also mechanical services rendered in connection with the cars operated by the Welfare Department. The trial court in ruling upon the admissibility of the exhibits stated that they were being admitted solely as bearing on the question as to their falsity and the intent to defraud on the part of Croft and also on the part of the appellant. The court stated that these exhibits were admitted for no other purpose. The majority opinion has commented on these various exhibits to an appreciable extent. Whether there was sufficient proof of the falsity as to all these claimed exhibits was for the jury to pass on but another question relates to the appellant's familiarity with and knowledge of these particular claims and what they disclose. The appellant's, Cotton's, signature is shown to be on the requisitions attached to Exhibits 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, and 62, with the exception of three separate requisitions which were attached to certain exhibits. It is also shown that the appellant signed Exhibits 36, 37, 39, 42, 45, 46, 50, 54, 55, 60, 61, and 62 as a member of the auditing committee. It will thus be seen that the appellant had full opportunity to observe the character of these claims. He admitted he undoubtedly read and examined them when they were signed or initialed by him. If he read them, as he testified he did, he could have observed the apparent duplication of some of the articles claimed to have been purchased by the county. Croft testified as to the falsity of Exhibits 57, 59, 60, and 61. The remaining exhibits, namely, 35, 38, 56, 58, and 63 were not initialed, signed or audited by the appellant. They were not commented on by Croft in his testimony. The witness, Nimrod, a state examiner, testified regarding these exhibits. A review of his testimony and my own examination of them show that Exhibit 35 relates in part to a claim for the relining of brakes on seven cars. The invoice for this work was dated January 14, 1946, and the claim was filed January 30, 1946. The requisition was dated January 29, 1946. Exhibit 38, which has attached to it an invoice dated May 5, 1946, discloses an item for relining four-wheel brakes on all cars. The requisition was dated June 1, 1946. This claim was

filed June 1, 1946. Exhibit 56 is a claim filed November 21, 1945, to which is attached a statement dated November 10, 1945. This claim discloses an item for twenty tires. The requisition for this item is dated November 21, 1945. Exhibit 58 is a claim filed December 28, 1945, to which is attached a statement for four heavy duty tires and four heavy duty truck tubes. The invoice for these tires and tubes is dated December 20, 1945, and the requisition is dated December 28, 1945. Exhibit 63 is a claim filed November 29, 1945, attached to which is a statement dated November 15, 1945. Included therein is an item for twenty-four inner tubes. An unsigned requisition is dated November 29, 1945.

As bearing on the matter of the several transactions disclosed by these several claims is the testimony of Croft that he borrowed forty-five or fifty truck tires from a tire company for delivery to the Welfare office at the time of the initial examination relative to the tire purchases. There is also the testimony of the witness, Walters, who testified that when he inspected the tires at the Welfare office there was none of the size mentioned in the several claims. The testimony of the witness, Vavra, discloses that certain of the cars had not had brakes relined, yet an examination of the record and exhibits discloses that there are claims showing that the seven Welfare cars had brakes relined four times during the period of four months. The several claims also show certain mechanical work such as setting kingpins, inclinations, caster, camber and toe-in. It is shown by Exhibits 44, 45, 46; 47, 48, 49, and 52 that this work was done on seven Welfare cars at seven different times. Authorization for this work covered a period from January 3, 1945 to May 18, 1945. The appellant's signature appears on the requisitions covering these items. There is also evidence of duplication of claims for heaters as disclosed by Exhibits 50 and 51. The witness, Vavra, testified that no change of heaters was shown on six of the cars. There is also evidence of duplication for claims of license plates. In this connection it is revealed by the evidence that the claim for the license plates for the seven cars was $147. The evidence discloses that the actual cost of the licenses was $74.75. The majority opinion asserts that

there is no proof of the falsity of the claims filed. There has been certified to this court the several exhibits which have been examined and concerning which I have heretofore commented. In a large number of these claims it is observed that the statement for the claim was dated earlier than the requisition. This is not true in every case but it indicates the mode of carrying on the business activities of the county during the period in question. The establishment of the policy relative to requisitions is attributed to the appellant. It is shown by some of the requisitions attached to some of the claims that the appellant signed and approved them under the circumstances previously related. When the very purpose of a requisition is circumvented it has no value. It is also shown that in late 1945 and early 1946 the appellant thus had knowledge of this practice and participated in it. It is my belief that the evidence disclosed by the claims justified the trial court in submitting the question of the falsity of these claims to the jury for its consideration.

The jury was instructed that before it could consider these other claims that it would first have to find that they were false. The jury also had the right, as stated by the court in its instructions, to consider and pass on these matters as bearing upon the question of motive, intent, absence of mistake or accident and whether or not it embraced the common scheme and the connection and identity of the parties charged with the crime. State v. Vance, 119 Iowa 685, 687, 94 N. W. 204, and cases cited.

It is true that there is an absence of definite proof of the falsity of all the claims filed. However, it is my belief that the entire list of exhibits in question should be considered by the jury for the purposes heretofore mentioned. The appellant was amply protected by the instruction given.

The case of State v. Brady, 100 Iowa 191, 196, 197, 69 N. W. 290, 291, 36 L. R. A. 693, 62 Am. St. Rep. 560, cited in the majority opinion supports the admissibility in evidence of the claims in question. In the cited case this court approved the acceptance in evidence of all the claims filed with the county auditor by Brady for the transportation claimed to have been furnished by him as overseer of the poor for indigent persons.

The court also permitted the State in that case to introduce the records of the various railroads operating out of Ottumwa which showed or purported to show the ticket sales of these respective roads in that city. The court therein stated:

"The evidence we have referred to is clearly admissible * * * for the purpose of showing the knowledge, intention, and bad faith of the defendant. It seems to us that the evidence was also admissible for the purpose of proving a systematic scheme or plan on the part of the defendant to cheat and defraud the county, thus negativing the idea that the presentation of the claim in question, was accidental, or through oversight, or mistake. * * * The jury may well have found, from the evidence complained of, that the filing of the claim, and the receipt of the warrant charged in the indictment, was a part of a plan, or scheme, adopted by the defendant to cheat and rob the county. For this purpose, as well as for the purpose of establishing the defendant's knowledge of the falsity of the claim, the evidence was admissible."

In this same case the question arose as to the admissibility of an exhibit on which there was a tabulated statement of tickets sold by representatives of the railroad. At page 199 of 100 Iowa, page 292 of 69 N. W., it is stated:

"As to the first thirty-one entries on Exhibit 13, there is no evidence showing, or tending to show, that no tickets were sold to the persons indicated on this exhibit; for Mr. Van Patten did not take charge of the railway offices until March 24, 1894, and all that portion of Exhibit 7, antedating March 24, was withdrawn from the evidence. * * * But, aside from all this, we think it clearly appears that the defendant suffered no prejudice from the ruling. This exhibit was merely a tabulated statement of the claims filed with the county by the defendant, and, if there was nothing to indicate that these first thirty-one claims were fraudulent, it is difficult to see how the defendant could have been prejudiced. The presumption would be that the claims were *bona fide*. Just how defendant would be prejudiced by proof of *bona fide* claims filed by him, we are unable to see."

This last quoted portion of the opinion is here set out inasmuch as it is the claim of the majority opinion that the admissibility of certain exhibits which it is claimed are not shown to be false resulted in prejudice to the appellant. It is difficult for me to see how one can be prejudiced by the introduction of exhibits which the majority opinion states were not false. It would thus appear to me to be carrying the question of claimed prejudice to an extreme.

II. In Division II of the majority opinion it is the holding that defendant's objections to testimony of witnesses Walters' and Powers should have been sustained and that the matters recited to the jury by these witnesses "were not competent or material to the issues of the case, and were certainly prejudicial." As disclosed by the testimony incorporated in the majority opinion the appellant, Cotton, remained silent during most of the recital of the statements made by the two previously referred to witnesses. In my judgment this was a proper matter for the consideration of the jury on the basis of the authorities cited in the majority opinion. Reference is therein made to the case of Friedman v. City of Forest City, 239 Iowa 112, 133, 134, 30 N. W. 2d 752, 763. In that case it is stated:

"An admission may be inferred from silence where the silence is improper or unnatural; and a definite statement of fact in connection with a failure to reply thereto, is, under certain conditions, allowed in evidence as an admission of the truth of the statement. 31 C. J. S., Evidence, section 294. However, such evidence should be received with caution and is incompetent if the situation or conditions are not such that the natural and reasonable inference from such silence is an admission of the truth of the statement. Doherty v. Edwards, 227 Iowa 1264, 1272, 290 N. W. 672. The inference may be safely made only where no other explanation is equally consistent with silence. I Wigmore on Evidence, Third Ed., section 107. See, also, Smith v. American Stores Co., 156 Pa. Super. 375, 40 A. 2d 696, 698.

"Preliminary questions relating to such evidence are for the court, such as the question whether the circumstances are such

as to call for a reply. 31 C. J. S., Evidence, section 296; Pulver v. Union Inv. Co., 8 Cir., Minn., 279 F. 699, 705."

By referring to 31 C. J. S., Evidence, section 296, page 1064, I find this statement:

"It is for the court to determine as a preliminary question whether the circumstances were such as reasonably to require a party to reply to a statement addressed to him.

"On the other hand, it is for the jury to decide whether the party actually heard and could understand the statement."

It has been the apparent late policy of the majority of this court to grant to the jury the right to pass upon most matters which are presented in the trial of a case. In the instant situation the trial court, in the discretion which it had, determined that the testimony was proper as bearing upon the question whether a reply would naturally be expected from the appellant. It was then for the jury to decide whether or not the appellant actually heard and understood the statements.

The majority opinion says the examination was prejudicial. On this question the court very carefully instructed the jury in instruction No. 23a, as follows:

"You are instructed that the statements alleged to have been made by the witness for the State, B. J. Powers, and by the witness for the State, Paul Walters, in the presence of the Board of Supervisors in July of 1946, as to the results and conclusions alleged by said witnesses to have been reported to the Board of Supervisors cannot be considered by you as proof of the truth of the alleged statements made by said witnesses in the presence of the defendant, but that said statements are only evidence of the fact that said witnesses made said statements at said time and place."

As further bearing upon the question of the admissibility of this testimony and the fact that the appellant did not reply when questioned, attention is called to 22 C. J. S., Criminal Law, section 734, pages 1258–1266. In this last citation at page 1259, it is stated:

"Silence alone, however, raises no legal presumption of guilt, see supra §598, and it is not equivalent to an admission of guilt. *Its effect is for the jury,* and from it, in connection with other facts and circumstances, they may infer that accused is guilty. It has also been held that more must appear than that accused heard the statement; there must be some warrant from the conduct of accused after hearing the statement to give rise to a reasonable inference of acquiescence." (Italics supplied.)

Further authorities to this same effect are: 20 Am. Jur., Evidence, section 570, page 483; 80 A. L. R., annotation 1235.

III. Division III of the majority opinion is apparently set out as the basis for comments made in Division IV. Exception is taken to the first sentence of instruction No. 22 which states that certain evidence has been given "tending to show that certain statements were made by the defendant on the occasions testified to by said witnesses; these statements, if made, being admissions of certain facts tending to establish the defendant's guilt of the offense charged."

The majority opinion holds that the portion of the instruction heretofore set forth usurps and invades the province of the jury. Let us see what this instruction discloses. It is therein stated that testimony has been given "* * * tending to show that certain statements were made by the defendant." It does not say that they were made. This instruction further states "* * * these statements, *if made,* being admissions of certain facts tending to establish the defendant's guilt of the offense charged." (Italics supplied.) It will be observed that in this instruction it does not state that the statements were made but if they were made they might be considered as being admissions of certain facts tending to establish the defendant's guilt. It should also be kept in mind that the latter part of instruction No. 22 is as follows:

"With respect to the testimony as to the *alleged* oral admissions made by the defendant, you are instructed that such evidence, being the mere repetition of oral statements and therefore subject to much imperfection and mistake through misunderstanding, excitement, fear or impulse of the party charged,

and the want of proper understanding of the words by the witnesses being the hearers and their imperfection of memory, such evidence should be cautiously received, but when such statements are deliberately and voluntarily made and correctly given they are often satisfactory evidence, and it is for the jury to consider all the circumstances under which such admissions were made, if they were made, and give them such weight and credit as they are entitled to, and no more and no less." (Italics supplied.)

In this last quoted portion of this instruction it refers to the alleged oral admission. It is a cardinal rule of this court that instructions should be taken as a whole and that an isolated portion of an instruction should not be made the basis of a critical analysis as to what the entire instruction sets forth.

IV. In Division V of the majority opinion comment is made concerning the refusal to give appellant's requested instruction No. 6. It is difficult to reconcile the statements made in the majority opinion with the latter part of instruction No. 22. The majority opinion uses as one basis for a reversal the fact that the court did not give requested instruction No. 6 and comments on the fact that the latter part of instruction No. 22 refers only to the testimony of the defendant and does not apply that instruction to other witnesses. It seems to me that this is too narrow a construction to be the basis of a reversal. Jurors are individuals who can apply their general knowledge and information to the facts under consideration and would know that they should apply the same rule applicable to the appellant to other witnesses. I see no basis for a reversal in Division V of the majority opinion.

V. The majority opinion in its Division VI holds that the trial court committed error in the sustaining of objections by the State to the cross-examination of the witness, Croft, with reference to his claimed ownership in certain cars which he mortgaged. The majority holds that this ruling was wrong and prejudicial. It is true that liberal cross-examination is the rule but it is also a rule which has been long recognized by this court that the matter and extent of cross-examination is within the sound discretion of the trial court. This should be partic-

ularly true when the subject matter is of a collateral nature. The cases cited in the majority opinion under this division may be applicable to the facts in the particular case but that does not necessarily mean they are applicable to the facts in the instant case.

A perusal of the majority opinion discloses that a substantial basis for a reversal is the claimed prejudicial manner in which the trial was conducted. As set forth in this dissent I, personally, am satisfied that prejudice has not resulted. This is a judicial conclusion which the majority has reached and in so doing they have substituted their judgment for that of the jury. As evidenced by the majority opinion this is apparently their appellate prerogative. I, too, have a sincere desire that every criminal case may be devoid of prejudicial circumstances but it does not appear to me there is sufficient basis for such a holding under this record. The jury is thus denied their right to pass on, what is in my judgment, a proper record.

I would affirm.